IN THE UNITED STATES DISTRICT COURT FOR THE

Northern _____ DISTRICT OF _Floridon_

_11th._ DIVISION

**FILED**

SEP 19 2011

CLERK, U. S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

---

Motion under Title 18 U.S.C. §2422(b)and 2423(a) and U.S. Sentencing
Guidelines §1b1.10(c) for Reduction of Sentence Based on Guidline
Amendment 732 Which became effective on Noverber 1, 2009 and Caused
a Two-level Reduction in Base Offense Level for U.S.S.G §2G1.3(b)(2)(b)
for"unduly influencing".

---

Bobby J Hibbs
Petitioner

Vs

United States of America.

Criminal Case No. 3:02-00-102-J-33-
MRC
MCR
SV

---

COMES NOW, The petitioner, Bobby Hibbs _____, Acting on his
own behalf and REQUSTS this Honorable Court to used its discretion
and Grant him the relief provided in the 2009 Guideline Amedment 732.
Befor Amendment 732 was modified were you could get the Two-Level
enhancement under U.S.S.G. §2G1.3(b)(2)(B) for 'unduly infuencing'
a minor to engage in prohibited sexaul conduct..even when that conduct
is only with a Law enforcement agent. Now this enhancement will no
longer apply if the person being influenced is a Law enforcement
agent. and the Sentenced be adjusted downward by Two-Level...

Based on the following information, Petitioner qualifies for the
Two-Level reduction in his sentence and REQESTS that relief be grated.

1. Date of Coviction (whether by guilty plea or trial) _Nov 19, 2003_
2. Date of Sentencing ( the last time you were sentenced, if you were re-sentenced) _____.
3. Did 'Unduly infuencing alone cause your Base Offense Level (BOL) to be greater than level 12? _Yes_____. if no, Amendment 732 dose not apply to you. If "YES" or 'don't know' proceed with this motion.
4. List the level that your sentence was based and the count related to the level.

   level_____for Conut(s)_____
   level_____for Count(s)_____
   level_____for Count(s)_____

(If you received more than one sentence and the sentences are different use additional lines)

5. What was your Criminal History Category? (Circle One)

   I  (II)  III  IV  V  VI

6. What was your sentencing rage and sentence befor Amendment732? Sentencing range _210_____.Ireceived a sentence of _210 month_ for count _2,_____. If applicable, write in any other sentences you received for 'Unduly influencing'that is different from the sentence you listed.

7. What is your offense level and sentencing range after a two-level reduction base on Amendment 732?
   Level _don't Know_ Sentencing range _Don't Know_ Count(s) _Don't Know_.
   If more than one sentence that is different from the one above (Unduly Influencing only).
   Level_____Sentencing_____Count(s)_____.
   Level_____Sentencing_____Count(s)_____.

8. Petitioner's projected release date at this time is_July 31, 2022_.
   Petitrespectfully Request to be sentenced at the bottom of his new sentencing range.
   Respectfully submitted this _15_ day of _Sept_____ , 2011

   Signature of Petitioner_Bobby Hibbs_
   Typed Name of Petitioner _Bobby J Hibbs_
   Register Number _26463-001_
   Address of Petitioner _Bobby Hibbs_
   _F C I_
   _P. O. Box 9000_
   _Seagoville, Tx 25159_

## Application for Relief by
### MOTION

(A) Grounds for relief sounght.

1 Amendment 732.

2. Ineffective Counsel.

3. Guidedline that are wrong.

4. Medical need of aging prison simply not being met.

Ask my publia defender to help and he said no . told me to put back ibn court.

(b) Accompanying Documents:

1. Paper work showing why Amendment 732 should be look at.

2. the other thing wrong with my P.S.I. and J & C.

3. What the Publia Defender Attornery did wrong.

4. I will have all my Medical record  with me for court.

5 Paper work showing how much I make here. at F.C.I. Seagoville,  Tx

Another good example of successful § 3553(a) arguments can be found in a Florida district court case. In udnited States V Stellabuto, the Middle District of Florida granted a variance and sentenced the defendant, who had an offense level of 34 and a Criminal History Category of 1 (which provides for a suggested sentence of 151-188 months) to 76 months in prison. To help the sentencing court reach that decision, the defense attorney provided the court with reasons to grant the variance based on the defendant''s trobled history, psychological evaluations, post-offense rehabilitative efforts taken byt the defendant the defendant's sincere remorse, and the history and disparity in the Guidelines as applied to viewers of child porn. versus participants in the making of it. All of this information help the court tailor a sentence based on the §3553 (a) factors for the defendant. Practitioners should consider providing sentenceing court with similar information it it will provide support for leniency. There are many similar district court that have emerged from around the country as courts grapple with the draconian sentences called for in the Guidelines for traditional viewer case. Combining back-ground information with legal and statistical analysis can enhance the chances of success in geting a client a more lenient sentence than what is likely called for in the Guidelines in these types of case.

Regrettably, Congress acrts and overreacts to certain crimes as they appear to increase in society. Congress all too often responts with unreasonable sentencing ranges without regard to hearings, expert information, research, or analysis. This was the case for decades in the crack cocaine cases and now in possession of child pornography cases. The sentencing given for possesion and viewing cases are disparate and draconian to the indvidual and often greater than necessary to achieve the goals of sentencing under the statute. Court's are begining to recgnize that a Guidelines sentence in a possession of child pornography case is often to severe: sometimes they either disregard the Guidelines entirely or grant a variance. Practitioner should continue to highlight the severity of a Guidelines sentence to the run-of the mill possession of child pornography case and give the court the ammuntion it needs to impose a sentence more appropriate for the crime. Even though most possession cases cannot receive less than a minimun mandatory sentence of five years.

(2) *Ensuring That a Plea Is Voluntary.* Before accepting a plea of guilty or nolo contendere, the court must address the defendant personally in open court and determine that the plea is voluntary and did not result from force, threats, or promises (other than promises in a plea agreement).

(3) *Determining the Factual Basis for a Plea.* Before entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea.

### (c) Plea Agreement Procedure.

(1) *In General.* An attorney for the government and the defendant's attorney, or the defendant when proceeding pro se, may discuss and reach a plea agreement. The court must not participate in these discussions. If the defendant pleads guilty or nolo contendere to either a charged offense or a lesser or related offense, the plea agreement may specify that an attorney for the government will:

(A) not bring, or will move to dismiss, other charges;

(B) recommend, or agree not to oppose the defendant's request, that a particular sentence or sentencing range is appropriate or that a particular provision of the Sentencing Guidelines, or policy statement, or sentencing factor does or does not apply (such a recommendation or request does not bind the court); or

(C) agree that a specific sentence or sentencing range is the appropriate disposition of the case, or that a particular provision of the Sentencing Guidelines, or policy statement, or sentencing factor does or does not apply (such a recommendation or request binds the court once the court accepts the plea agreement).

```
If you look at my court case you will fine that ther was not
" Plea Agreement"
```

© 2011 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

United States v. Italiano, 837 F.2d 1480 (11th Cir. 1988); United States v. Deisch, 20 F.3d 139 (5th Cir. 1994) ("To be sufficient, an indictment must allege each material element of the offense; if it does not, it fails to charge that offense").

*[handwritten: Ask to see Grand Jury indictment to see]*

The Grand Jury Clause of the United States Constitution provides that "no person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. Amend. V. The court said that: "to comport with the Fifth and Sixth Amendments, a criminal indictment must (1) contain all of the elements of the offense so as to fairly inform the defendant of the charges against him, and (2) enable the defendant to plead double jeopardy in defense of future prosecutions for the same offense." United States v. Santeramo, 45 F.3d 622, 624 (2nd Cir. 1995) (per curiam).

## E. MULTIPLICITY AND DUPLICITY

Indictments charging a single offense in different counts are multiplicious. See United States v. Seda, 978 F.2d 779, 780-82 (2nd Cir. 1992) where the indictment charging bank fraud and false statements to obtain the loan in separate counts were considered multiplicious. See also United States v. Langford, 946 F.2d 798, 802 (11th Cir. 1991) wherein the indictment charging multiple counts of conspiracy based on multiple mailings in furtherance of a single conspiracy to commit securities fraud was also considered multiplicious. When several factual allegations are each elements of the same offense, the defendant may be charged with only one count of that offense. See United States v. Pal, 894 F.2d 895, 897-98 (7th Cir. 1991). A particularly interesting case is United States v. Anderson, 872 F.2d 1508, 1519-20 (11th Cir.) wherein the indictment charging violations of the same general conspiracy statute in three (3) separate counts was multiplicious when the multiple criminal actions involved only one conspiracy. For example, where there are conspiracies and substantive crimes committed in the completion of the conspiracies, these are distinct offenses and may be charged separately; an indictment charging conspiracy in an attempt to import controlled substances in one count, and attempt to import specific plane loads of controlled substances in separate counts, is not considered multiplicious because the separate statutes were violated. See United States v. Love, 767 F.2d 1052, 1062-63 (4th Cir. 1985), cert. denied, 474 U.S. 1081 (1986).

Indictments charging two or more distinctive offenses in a single count are duplicitous. Duplicitous indictments obscure the specific charges and may violate a defendant's constitutional right to notice of charge against him/her. This may also hinder ability to plead double jeopardy in a subsequent prosecution. Duplicitous indictments may also prevent the jury from separately deciding guilt or innocence with respect to each particular defense, thus creating uncertainty as to whether the defendant's conviction was based on a unanimous jury's decision.

*[handwritten: My attorney did not do]*

### F. PLEADING GUILTY OR GOING TO TRIAL *[handwritten: ALL]*

The second most difficult decision you will make, barring cooperation, after arrest and/or during the course of your pretrial proceedings is whether to plead guilty or go to trial. Pleading guilty can result in mitigation of your case based upon relevant conduct factors, role adjustment, acceptance of responsibility and other sentencing guideline issues.

The Federal Rules of Criminal Procedure, under Rule 11, requires full disclosure of the terms of the plea bargain and you are permitted to enter a guilty plea only if knowingly and voluntarily with the advice of competent counsel. See Tollett v. Henderson, 411 U.S. 258, 263 (1973). Once a person enters a plea of guilty, they waive a number of constitutional rights, so the importance of identifying a voluntary and knowing plea is not only formatted through court action, but through written disposition and the Federal Sentencing Guidelines.

Pursuant to 6B1.1(c), *"the court shall* (emphasis supplied) *defer its decision to accept or reject any non-binding recommendation pursuant to Rule 11(e)(1)(B), and the court's decision to accept or reject any plea agreement pursuant to Rules 11(e)(1)(A) and 11(e)(1)(C) until there has been an opportunity to consider the presentence report, unless the report is not required under 6A1.1."* Pursuant to 6B1.4, *"(Policy Statement)*

*(a) A plea agreement may be accompanied by a written stipulation of facts relevant to sentencing. Except to the extent that a party may be privileged not to disclose certain information, stipulations shall:*

*(1) set forth the relevant facts and circumstances of the actual offense conduct and offender characteristics;*

*(2) not contain misleading facts; and*

*(3) set forth with meaningful specificity the reasons why the sentencing range resulting from the proposed agreement is appropriate.*

*(b) To the extent that the parties disagree about any facts relevant to sentencing, the stipulation shall identify the facts that are in dispute.*

*(c) A district court may, by local rule, identify categories of cases for which the parties are authorized to make the required stipulation orally, on the record, at the time the plea agreement is offered.*

*(d) The court is not bound by the stipulation, but may with the aid of the presentence report, determine the facts relevant to sentencing."*

Rule 11(e)(2) of the Federal Rules of Criminal Procedure require *"disclosure of the plea agreement"* to the district court at the time the guilty plea is taken. This rule is properly read to mean that all "material terms" or "material details" or "elements" of the agreement must be disclosed. The purpose of this requirement (disclosure with specificity) is to enable the district court to probe a Defendant's understanding of the consequences of his plea bargain and the voluntariness of entering it. See <u>United States v. Daniels</u>, 821 F.2d 76, 80 (1st Cir. 1987), and <u>United States v. Blackner</u>, 721 F.2d 703, 708 (10th Cir. 1983). There cannot be an entry of a plea with specificity without a complete understanding of the impact of the PSI and its content.

United States Sentencing Guideline 6B1.4 stipulates that with respect to relevant policy, that plea agreements accompanied with written stipulations of fact, relevant to sentencing, set forth the relevant facts and circumstances of the actual offense conduct, not contain misleading facts, and sets forth with meaningful specificity why the sentencing range from the proposed agreement is appropriate. The purpose of this Sentencing Commission Policy Statement is to provide a Defendant with reliable information upon which to make an informed plea and understand the sentencing consequences. Additionally, the Commission has adopted a policy to further promote the Sentencing Reform Act goal for *"truth in sentencing"* by articulating the factors relevant to the development of a Defendant's particular sentencing guideline range by stating, *"the Commission encourages the prosecuting attorney, prior to the entry of a plea of guilty or nolo contendere under Rule 11 of the Federal Rules of Criminal Procedure, to <u>disclose</u> to the defendant the facts and circumstances of the offense and offender characteristics 'then known to the prosecuting attorney, that are relevant to the application of the sentencing guidelines."* See U.S.S.G. 6B1.2, Commentary, Rule 11(e)(2) of the Federal Rules of Criminal Procedure requires *"disclosure of the plea agreement"* to the district court at the time the guilty plea is taken. The specificity

of disclosure is significant to enable the district court to probe the defendant's understanding of the consequences of his bargain, and the voluntariness of his entering it. See <u>United States v. Daniels</u>, 821 F.2d 76, 80 (1st Cir. 1987) and <u>United States v. Blackner</u>, 721 F.2d 703, 708 (10th Cir. 1983). Also see <u>Santobello v. New York</u>, 404 U.S. 257 (1971); <u>United States v. Fisch</u>, 863 F.2d 690 (9th Cir. 1988).

Plea bargaining resolves the majority of federal cases. Some specific stipulations in the plea bargain can reduce the expected outcome of the sentencing process. However, be wary of the United States Probation Office and the preparation of the PSR which may result in a different interpretation to your expectations from any plea agreement. An experienced attorney can help you navigate these rough waters. *Endn. 1.*

## G. GOING TO TRIAL

At trial, the government is required to prove that beyond a reasonable doubt you are guilty of all of the charges brought against you. They will present all of the evidence they have to the jury in making a determination of guilt or innocence. One of the key features of guilt or innocence is the use of informants who are part of the criminal case. These informants, even though many lack credibility, are often believed by jurors because their information is corroborated by federal agents or police officers. However, discrediting those witnesses is critical to successful litigation at trial. Discrediting witnesses comes in the form of showing the jury that those individuals received a benefit for their testimony, and to show, if possible, that their backgrounds are filled with prior criminal conduct and deception.

Taking your case to trial is complicated. One of the key features of successful trial litigation is to be sure you have defense witnesses, if available, to offset the facts the government is going to present against you. Oftentimes attorneys will choose not to bring in defense witnesses because the government may not have proven some of the case. Some examples of defenses are:

1. Alibi

2. Entrapment vs. Acceptance of Responsibility

3. Actual Innocence

4. Multiple Conspiracies



## H. PRETRIAL MOTIONS CAN HELP THE TRIAL PROCESS BE MORE SUCCESSFUL

There are a number of motions that can be filed in a pretrial capacity that can help you make a decision of whether to plead guilty or go to trial. These are traditionally called **DISCOVERY MOTIONS**. Discovery motions are generic in form but are designed to require the government to release to you all of the information that they have against you. They do not have to release all of the information well in advance of the trial, and in some jurisdictions, only a few days before trial is required.

In <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), the Supreme Court held that the prosecution must turn over to the defense, upon request, any information within its possession that is material to either the Defendant's innocence or his punishment. The duty to disclose extends to any information within the possession of any attorney or agent in the prosecutor's office (*See* <u>Giglio v. United States</u>, 405 U.S. 150 (1972)), and any known information within the possession and/or control of cooperating law enforcement personnel. *See* <u>United States v. Brooks</u>, 966 F.2d 1500 (D.C. Cir. 1992). The prosecution has a duty, under Rule 16, to search the investigative files of other government agencies for evidence material to the defense even if the prosecution does not intend to use such evidence at trial. The government's obligation extends to information in the possession or control of staff or other persons who participated in the investigation and evaluation of the case. *See* <u>United States v. Bailleaux</u>, 685 F.2d 1105, 1113-14 (9th Cir. 1982), and <u>United States v. Jensen</u>, 608 F.2d 1349 (10th Cir. 1979).

Moreover, this duty to disclose extends to any information that may tend to impeach a witness or discredit the witness' testimony. The prosecutor's duty to disclose information is especially great when specific information is requested by the defense. *See* <u>Agurs v. United States</u>, 427 U.S. 97 (1976).

This information is especially important as it is necessary to effectively cross-examine key prosecution witnesses. *See* <u>Davis v. Alaska</u>, 415 U.S. 308 (1974).

In <u>Jencks v. United States</u>, 353 U.S. 657 (1957), the Supreme Court held that the federal government in a criminal prosecution must turn over to the defense, for impeachment purposes, certain statements made to federal agents by government witnesses.

Voluntary disclosure is encouraged. Notes of Advisory Committee, Fed.R.Crim.P. 26.2.

The government's failure to provide discovery of <u>all relevant</u> Jencks Act material is error. In <u>United States v. Bibbero</u>, 749 F.2d 581, 585 (9th Cir. 1984), *cert. denied,* 471 U.S. 1103 (1985), a cooperating accomplice testified for the government regarding the defendant's activities.

In <u>United States v. Shoher</u>, 555 F.Supp. 346, 352 (SDNY 1983), the court stated that the prosecution must disclose the information sufficiently far in advance to permit "effective evaluation, preparation and presentation."

In order for production to be meaningful, counsel should be granted sufficient time to evaluate the material. <u>State v. Sette</u>, 242 S.E.2d 464 (WVa. 1978). *Enid*.

## I. SELECTING A JURY

In selecting a jury, your attorney should try to obtain permission from the court to ask extensive background questions of the jurors. This is commonly known as *voir dire. Voir dire* includes such things as background questions, bias, relationship with parties involved in the case, geographic and cultural background considerations.

A jury questionnaire is often allowed as long as it is not overly extensive. Some courts do not allow jury questionnaires to be given to the jurors directly but will allow additional questioning of the jury with submissions from defense counsel to the judge. The judge will do the questioning of the jurors and select those that the judge feels are applicable. Of specific interest are those where cultural differences might affect the jury's attitude toward a particular defendant. This is particularly true in African-American, Latin and Korean jury selection processes. Some questions should be given to the court to ask the jurors concerning any biases they may have from pre-conceived stereo types such as all drug dealers are African-American or Latin males.

## J. FEDERAL RULES OF EVIDENCE

The Federal Rules of Evidence are complicated and detailed and have to be followed. Objections to matters of error by the government or the court are made during trial or sentencing in order to protect the record for appeal. The best way to get a successful appeal is to protect the record of any error, both evidentiary and factual, as well as any error by the court, such as jury instructions and the admission of evidence that is

inadmissible. If you plead guilty or convicted, there are three (3) phases remaining for you to contemplate.

1. Sentencing (objections to the PSR must be made with specificity)
2. Appeal
3. Habeas Corpus

## K. SENTENCING

Sentencing is a complicated proceeding unless all of the Federal Sentencing Guidelines issues have been resolved through plea bargaining. Many times going to trial can help resolve relevant conduct questions that can reduce the outcome of the sentence, even after conviction.

One of the most complicated areas of sentencing guidelines is relevant conduct and how much drugs or money, or other features of relevant conduct, should be held against you for purposes of setting the base offense level. Enhancements such as role, obstruction of justice and Criminal History Score are also critical factors in determining the outcome of the sentence. The PSR is not evidence. Since the PSI is not evidence, specific findings of fact as to disputed issues of fact or guideline matters must be carefully reviewed. *See* United States v. Garrido, 995 F.2d 808 (8th Cir. 1993) at 812 (n.6); United States v. Leichtnam, 948 F.2d 370 (7th Cir. 1991); and United States v. Bluske, 969 F.2d 609 (8th Cir. 1992) at 616 (n.5). *Also see* United States v. Wise, 976 F.2d 393 (8th Cir. 1992) and United States v. Streeter, 907 F.2d 781, 791-92 (8th Cir. 1990), that a *"presentence report is not evidence and is not a legally sufficient basis for making findings on contested issues of material fact."* The court is required to follow Rule 32 Federal Rules of Criminal Procedure in responding to objections to the PSR. Some of the many sentencing issues that may arise are:

1. Relevant conduct exposure (offense level);
2. Aggravating or mitigating role;
3. Obstruction of justice;
4. Acceptance of responsibility;
5. Criminal history;
6. Upward or downward departure;
7. Cooperation;
8. Firearms enhancements, non-statutory.

We do not recommend having a presentence report interview without an attorney present.

## L. APPEALS

After a conviction is handed down and the sentencing hearing is concluded, there may be a sense of finality and hopelessness as to the results of the preliminary proceedings. However, there is an opportunity to change this situation around. Enter the appellate and post-conviction attorney. Through experience with the system and expertise in thoroughly examining trial motions and transcripts, the appellate and post-conviction attorney may provide valuable assistance in matters which arise either after trial or after sentencing or both.

After trial and sentencing, the defendant can be represented by an attorney who can take a fresh look at their case. In some instances, for this to occur, trial counsel should not handle appeals, or at least not do so alone.

The appellate and post-conviction attorney examines the whole case, from indictment to trial to sentencing, searching for pertinent issues that could substantiate a different outcome. This includes, but is not limited to, rulings on pretrial motions, the pertinent criminal code sections, search and seizure issues, defective indictments, illegal sentences, and a wide array of constitutional issues. For example, in Duhart v. United States, 476 F.2d 597 (6th Cir. 1973), the court found that a motion to vacate sentence could be properly raised based on the claim that Petitioner was illegally arrested, and therefore the evidence found in his car was also illegal. Also, in United States v. Donaldson, 978 F.2d 381 (7th Cir. 1992), the court held that convictions tainted by constitutional errors must be reversed unless the errors are harmless. And finally, searches conducted outside proper judicial process, without prior approval of judge or magistrate, are generally per se unreasonable. United States v. Morris, 977 F.2d 677 (1st Cir. 1992). Therefore, having an appellate and post-conviction attorney on your side may prove beneficial to your case.

## M. HABEAS CORPUS (2255)

Federal prisoners seeking post-conviction relief on issues relating to trial or sentencing controversies must apply for a Writ of Habeas Corpus to the sentencing court under Title 28 U.S.C. 2255 within one year from the latest of:

1. the date in which judgment of conviction becomes final;

2. the date on which the impediment to making a motion created by governmental action in violation

of U.S. laws or the Constitution is removed, if movant was prevented from making a motion by such governmental action;

3. the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review;

4. the date on which the facts supporting the claim[s] presented could have been discovered through the exercise of due diligence.

In plain language, this means that while in the past, §2255 motions could be made "at any time," there are now significant time restrictions. For example, it is the latest of these four dates that counts. Thus, if a new, retroactive Supreme Court case affects your conviction, you have one year from the date of that decision, even if you have been incarcerated for several years, to file a 2255. For most other claims, though, you will likely only have one year from when "the judgment of conviction becomes final" (which could differ depending on whether your case was appealed or a Writ of Certiorari was filed). Although the last exception allows for newly discovered evidence to be an excuse, the section contains a "due diligence" requirement which is often read quite strictly. A habeas under this statute is for the purpose of vacating, setting aside, or correcting a sentence or conviction that the court imposed. The most successful reasons for filing a 2255 is:

- Inaccurate information in the PSI
- Error in guideline calculations
- Illegal Sentence
- Ineffective assistance of counsel
- Counsel's failure to investigate or call witnesses
- Trial errors based on counsel's failure to present evidence
- Evidence from trial not properly presented at sentencing.

Section 2255 provides for relief where the sentence was imposed (1) in violation of constitutional laws of the United States; (2) where the court was without jurisdiction to impose the Petitioner's sentence; (3) where the sentence was in excess of the maximum authorized by law; and (4) where the sentence is otherwise subject to collateral attack. *See* Hill v. United States, 368 U.S. 424 (1962). A petitioner seeking to challenge the legality of the imposition of a sentence by a court may therefore make a claim pursuant to Section 2255. *See* Dioguardi v. United States, 587 F.2d 572 (2nd Cir. 1978) (a motion under Section 2255 must...be directed to the sentence as it

was imposed, not to the manner in which it is being executed).

## CONCLUSION

Hiring a criminal defense lawyer is paramount to taking the appropriate steps in getting the best results. Learn more about the defense attorney representing you and what their federal experience is. Merely being a former prosecutor does not necessarily make the best defense attorneys though some are exceptional. A good federal defense lawyer should have experience in federal criminal law, pre- and post-conviction. Sometimes it is better to hire two (2) lawyers, one for the pre-trial process, and one to help from the beginning of the pre-trial process to the end of the case to ensure the record is perfected for sentencing and post-conviction relief. Defense teamwork is a practical way to cover all of the aforementioned bases. Hiring a litigation lawyer and a mitigation lawyer are critical to success. If an attorney you are interviewing is not amenable to working with other lawyers, that could be a problem and you should consider that in making your choices on who to retain. Federal Criminal Defense Lawyers can work in any state in the country, either by admission or by pro hac vice and local counsel relationships. Do not be intimidated by hiring an attorney that may not come from the town in which you are charged. Do not be afraid of hiring more than one lawyer, and if you have only enough funds to hire one lawyer, hire one that is experienced in criminal law.

**Pre-Plea, Sentencing, Appeals and Habeas Corpus**

**WHEN IT'S TIME FOR A CHANGE**
All Federal Circuits

**LAW OFFICE OF MARCIA G. SHEIN**
**FEDERAL CRIMINAL LAW CENTER**
Voice: 404-633-3797
Fax: 404-633-7980
www.FederalCriminalLawCenter.com
www.MSheinLaw.com
Marcia@MSheinLaw.com
**Consultation/Representation since 1981**

This newsletter is available only by request. If you would like to be added to or removed from our mailing list, please let us know.

result of pressure by Congress; (2) following § 2G2.2 will often result in a Guideline sentence greater for a viewer than one who has had actual inappropriate contact with a minor; and (3) many of the enhancements apply in run-of-the-mill cases.

In *United States v. Dorvee,*[62] the Second Circuit emphatically announced that the Federal Sentencing Guidelines for child pornography cases could be abused. In that case, the PSR initially calculated the Guideline range of 262 to 327 months based on a total offense level of 39 with a Criminal History Category of I. The PSR, however, noted that because the statutory maximum for the offense of conviction was 20 years incarceration "the Guideline range would be 240 months." The preliminary evaluation in the PSR revealed that the offense level would be 22 but for the extraordinary and draconian enhancements applied: §§ 2G2.2(b)(2), 2G2.2(b)(3)(E), 2G2.2(b)(4), 2G2.2(b)(6), and 2G2.2(b)(7). The sentencing court imposed a sentence of 233 months and 16 days.

On appeal, the Second Circuit discussed at great length the various enhancements that were applied. The court confirmed that the enhancements applied to the defendant may not have been appropriate and created an unreasonable sentence. In reaching this conclusion, the court examined how the Guidelines have been cobbled together over time and explained that "the Commission did not use this empirical approach in formulating the Guidelines for child pornography. Instead, at the direction of Congress, the Sentencing Commission has amended the Guidelines under § 2G2.2 several times since their introduction in 1987, each time recommending harsher penalties."[63] The court noted that the result of this process is that the Guideline sentence is often "near or exceeding the statutory maximum, even in run-of-the-mill cases."[64]

The court continued, noting the absurd results that could follow from blindly adhering to the Guidelines because "[h]ad [the defendant] actually engaged in sexual conduct with a minor, his applicable Guidelines range could have been considerably lower."[65] The court remanded the case for further proceedings on the unreasonableness finding.

In *United States v. Grober*[66] and *United States v. Hanson,*[67] the sentencing courts discussed the complications related to the type of sentencing process involved in a possession of child pornography case. These opinions cited liberally

an article by Troy Stabenow,[68] which discusses some of the flaws within § 2G2.2. Specifically, both *Grober* and *Hanson* cited the following passage from Stabenow's article with approval:

The flaw with U.S.S.G. § 2G2.2 today is that the average defendant charts at the statutory maximum, regardless of acceptance of responsibility and Criminal History. As noted by the Guidelines Commission, there are "several specific offense characteristics which are expected to apply in almost every case (e.g., the use of a computer, material involving children under the 12 years of age, number of images)." *See* Amendment 664,— U.S.S.G.App. C "Reason for Amendment" (November 1, 2004). The Internet provides the typical means of obtaining child pornography resulting in a two-level enhancement. *See* U.S.S.G. § 2G2.2(b)(6). Furthermore, as a result of Internet swapping, defendants readily obtain 600 images with minimal effort, resulting in a five-level increase. *See* U.S.S.G. § 2G2.2(b)(7)(D). The 2004 Guidelines created an Application Note defining any video clip as creating 75 images. *See* U.S.S.G. § 2G2.2(b)(2),(4). Thus one email containing eight, three-second video clips would also trigger a five-level increase. Undoubtedly, as the Commission recognized, some of these images will contain material involving a prepubescent minor and/or material involving depictions of violence (which may not include "violence" per se, but simply consist of the prepubescent minor engaged in a sex act), thereby requiring an additional six-level increase. See U.S.S.G. § 2G2.2(b)(2), (4). Finally, because defendants generally distribute pornography in order to receive pornography in return, most defendants receive a five-level enhancement for distribution of a thing of value. See U.S.S.G. § 2G2.2(b)(3)(B). Thus, an individual who swapped a single picture, and who was only engaged in viewing and receiving child pornography for a few hours, can quickly obtain an offense level

of 40. Even after Acceptance of Responsibility, an individual with no prior criminal history can quickly reach a Guideline Range of 210-262 months, where the statutory maximum caps the sentence at 240 months. See U.S.S.G. § 5G1.1(a).

The results are illogical; Congress set the statutory range for first time distributors as five to twenty years. Congress could not have intended for the average first time offender with no prior criminal history to receive a sentence of 210 to 240 months. An individual with a Criminal History Category of II faces a Guideline range of 235 to 240 months, and any higher Criminal History score mandates the statutory maximum. These results run contrary not only to congressional will, but also to a principal Guideline policy — providing harsher penalties to individuals with more significant Criminal History scores while still retaining an incentive for pleas at all Criminal History levels.[69]

The *Grober* court went on to discuss why § 2G2.2 does not accomplish the sentencing goals of 18 U.S.C. § 3553(a). First, § 2G2.2 enhancements apply almost all the time and operate exponentially. Second, § 2G2.2 enhancements promote sentencing disparity. Finally, there is a paucity of direct judicial experience to use in fashioning fair sentences. Ultimately, the *Grober* court did not apply the Guideline range the government had requested. Instead, citing the 18 U.S.C. § 3553 factors and the mandatory minimum set by Congress guided the court; it imposed a 60-month sentence.

On appeal, the U.S. Court of Appeals for the Third Circuit affirmed, citing *Dorvee* and the cobbling together of the applicable Guidelines.[70] The court also found it worthwhile to mention "that the Commission recently surveyed federal district court judges regarding their experience with, and opinions of, *inter alia,* the child pornography Guidelines, and found widespread dissatisfaction with § 2G2.2."[71]

The *Dorvee, Hanson,* and *Grober* cases are filled with golden nuggets for arguing against the traditional enhancements under § 2G2.2 of the federal Sentencing Guidelines in possession of




THE CHAMPION

SENTENCING MITIGATION IN CHILD PORNOGRAPHY CASES

## LOOKING FOR ASSISTANCE WITH YOUR LEGAL MATTERS?

When you are looking for answers to your legal problems, the Federal Criminal Law Center is the place to look. The Center provides full representation services as well as national legal research assistance on a *pro se* level Our attorneys are available to represent individuals on matters dealing with the trial process, plea and sentencing mitigation, objections to the presentence report, appeals, and *habeas corpus* petitions. Lead Counsel, Marcia G. Shein, has been practicing law throughout the country in the Federal Court system since 1992 and has been consulting with criminal defense lawyers throughout the country on issues of sentencing and post-conviction mitigation since 1981. Marcia G. Shein works diligently to mitigate the outcome of every case she is associate with, whether representing an individual, working with an attorney, or assisting an individual in preparing pleadings for *pro se* filing.

The Federal Criminal Law Center is currently seeking questions with potential general impact from criminal defendants. We will try to choose one question to answer that will help as many of you as possible on the issue raised in our future newsletters. We cannot answer every question, so please submit questions regarding important issues that may effect a large portion of the federal criminal justice population.

We also have available for purchase, *The Federal Criminal Law Inmate Handbook*, which gives offenders and their families vital information on the process of our Federal legal system from pre-trial to post-conviction.

---

### Marcia G. Shein is a member of the following courts:

- United States Supreme Court
- Northern, Middle, and Southern Districts of Georgia
- Northern, Eastern, Western, and Southern Districts of Texas
- Eastern District of Michigan
- District of Columbia
- Northern District of Oklahoma
- District of Nebraska
- District of Arizona
- Northern District of Florida
- Eastern District of Tennessee
- District of Colorado
- Northern and Southern Districts of Indiana
- First Circuit Court of Appeals
- Second Circuit Court of Appeals
- Third Circuit Court of Appeals
- Fourth Circuit Court of Appeals
- Fifth Circuit Court of Appeals
- Sixth Circuit Court of Appeals
- Seventh Circuit Court of Appeals
- Eighth Circuit Court of Appeals
- Ninth Circuit Court of Appeals
- Tenth Circuit Court of Appeals
- Eleventh Circuit Court of Appeals
- D.C. Circuit Court of Appeals

- Georgia Court of Appeals
- Georgia Supreme Court

---

### Marcia G. Shein has appeared *pro hac vice* in the following courts:

- Middle District of Alabama
- Northern District of Alabama
- Southern District of Alabama
- Western District of Arkansas
- Central District of California
- District of Connecticut
- Middle District of Florida
- Southern District of Florida
- Northern District of Illinois
- Southern District of Illinois
- Northern District of Iowa
- Southern District of Iowa
- Western District of Kentucky
- Western District of Louisiana
- District of Maryland
- District of Minnesota
- Southern District of Mississippi
- Eastern District of Missouri
- District of New Jersey
- Eastern District of New York
- Northern District of New York
- Southern District of New York
- Eastern District of North Carolina
- Middle District of North Carolina
- Western District of North Carolina
- Middle District of Pennsylvania
- Eastern District of Pennsylvania
- District of Puerto Rico
- District of South Carolina
- Middle District of Tennessee
- Western District of Tennessee
- Eastern District of Virginia
- Western District of Virginia
- Western District of Washington
- Northern District of West Virginia

Of all the recent dissenting opinions by Supreme Court justices, it was Justice Kennedy's recent remarks at an annual American Bar Association meeting on Aug 9, 2003 that caused the most controversy. Kennedy stated that guidelines were to harsh and called upon the bar to reform the guidelines. Kennedy argued that lawyers should confort Congress with the problems of mandatory minimums and noted that "it is a grave mistake to retain a policy just because a court finds it constitutional. He called upon criminal defense lawyers to ask the relevant executive for pardons in case where the prosecution unjustly used guidelines for long sentences. In contrast to Justice Kennedy's recent remark is position of Attorney General John Ashcroft. The attorney general's comments have caused a stir of constitutional proportions equal to the controversy over the initial debate over the constitutionality of the guidelines themselves. In responce to a directive in the recently enacted PROTECT Act, Ashcroft issued a memorandum on July 28,2003, directing federal prosecutors to oppose sentencing adjustments and departures "that are not supported by the facts and the law." The memorandum also amends §9-2.170(B) of the Attorney's manual so that it now requires porsecutors to report the following categories of "adverse" decisions (ie.,decision that the prosecutor opposed) to the Appellate Section of the Criminal Division of the Department of Justice for possible appeal;

1. Departures that change the zone in the sentencing table and result in no term of imprisonnment.
2. Departures based on criminal history where the extent of the departure is two or more criminal history categories or the equivalent.
3. Departures based on discouraged or unmentioned factors where the offense level before departure is 16 or more, and the departure is is three or nore offense levels.
4. Departures in child victim or sexual abuse cases.
5. third-level adjustments for acceptance of respibility, where there, was no government motion.
6. Depatures on remand, where the court ignored the limits in the PROTECT Act.
7. Recurring illegal departures, where (a) the court improperly departed and (b) the base for the departure has become prevalent in the district or with a particular judge.
8. Sentencer below a statutory minimum.
9. Any other adverswe sentecing decision that the U.S. attorney's office wishes to appeal.

As an original member of the Sentencing Commission, Justice Breyer has also spoken out against the current sentencing guidelines that he helped create. In a 1998 lecture, Breyer suggested that mandatory minimum sentences should be repeales and that the current guidelines were too long and confusing as currently written. He reiterated his dissent of mandatory minimums in Harris.

Chief Justice Rehnquist, writing on behalf of the judicial Conference in reponse to the PROTECT Act, Noted in a letter to Sen. Patrick Leahy (D-VT); " This legislation, if enacted, would do serious harm to the basic strcture of the sentencing guideline system and would seriously impair the ability of courts to impose just responsible sentence....

These changes to the guidelines seem to violate the separtiion of powers doctrine. Our justice system depends on a fair and impartial judiary that is free from intimidation by the other branches of gov. However, recent comments by the sttorney general suggest the he is attempting to breach this precious doctrine. The future of federal sentecing could get rather interesting in the next few years. Attitudes favoring changes to the guidlines have gained support amaong Supreme CourtJustices. with the proper case, renewed challengers to the constitutionality of mandatory minimums or the PROTECT Act reporting provision could very likely be successful with the current Supreme court.

U.S.C. § 2422(b) and 2423(a)

THhe two-level enhancement for use of a computer at §2G1.3(b)(3)
In addlied, the two-level enhancement for the offense involving a
sexual act or sexual contact at 2G1.3(b)(4) if convicted under
18 U.S.C §2423(a) whit application of either enhancement, the
mandatory mininmun trem of imprisonment of 120 months we be reached
in the majority of conviction under 18 U.S.C. §2422(b) and 2423(a,
befor application of other guidelines adjustments.
Further, the amendment addresses the interaction of two specific
offense characteristics with the slternative base offense levels.
First, every conviction under 18 U.S.C.§1591 necessarily involves
a commercial sex act. with the base offense levels being determined
based on the the staute of conviction, the amendment clarifies that
§ 2G1.3(b)(4)(B), which provides a two-level enhancement if the
offense involved a commercia sex act dose not apply if the defendant
is convicted under 18 U.S.C §1591 Second , the amendment precludes
application of the age enhancement in §2G1.3(b)(5) if the base
offense level isdetermined under subsection (a)(1)of §2G1.3 for a
conviction under 18 U.S.C. §159(b)(1). the baseoffense level provided
subsection (a)(1) of §2G1.3 take into account the age of the victim
and therefore, limitations on application of subsections (b)(4)(5)
and (b)(5)of §2G1.3 avoid unearranted
duble counting. under the U.S. Const. Amend. V. The court said that:
the comport with the fifth and Sixth Amendemt, a criminal indictment
must.
(1). Contain all of the elements of the offense against him;
(2). Enazble the defendant to plead double jeopardy in defense of
     future prosections for the same offense.

Indictments charging a signle offense in different counts is multiple.
and should fall under the Sixth Amendments right.
Now the Eighth, section 503 of the Adam Walsh Act.

18 U.S.C. §2257 A, Adoptine new recorkeeping obligations for production
of any book, magazine, periodical, Film, Videotape, or digital image
that contains a visual depiction of simulated sexually explicit
conduct. Section 2257 A has a statutory maximun of one year impris-
onment for the failure to comply with the recorkeeping requirements
and a statutory maximun term of imprisonment of five years if the
violation was to conceal a subtantive offense that involves either
causing a minor to degage in sexually expually conduct for the pupose
of producing a visual depiction or trafficking in material involving
the sexual eplotation of a minor. the new offense is similar to
18U.S.C. § 2257, Which is referenced to §2G2.5  Now if ther is "No"
actual minors.

Now the definition of "Unduly" is with out due cause or justification;
without proper regard to sathe right and wrong; unrightfully,
improperl. The definition of "influence" is to exert influence upon,
to affect by influence; to affect the mind or action of. The
dictionary definition of "undue influence" suggests, by its reference
toaffecting the mind or action of another. That there must be an
actual person who is affected in somme way.

An undercover law enforcement officer who is not at all persuaded
in thought or in deed, therefore, cannot be "unduly influenced"
thus, the plain language of U.S. Sentencing Manual ¶2G3.2(b)(B) (2003)
indicates that the Two-level enhancement should not be available in
cases involving undercover agents rether than actual minors.

**5. Sentencing**

Defendant was not entitled to acceptance of responsibility reduction under USSG § 3E1.1 after he pleaded guilty to interstate violation of protective order under **18** USCS § **2262**; defendant had failed to clearly demonstrate that he had not engaged in conduct inconsistent with his acceptance of responsibility because, following his arrest, he had repeatedly attempted to contact his wife, who was subject of protective order; defendant's post-plea conduct established that it was more likely than not that he had continued to violate protection order. United States v Robinson (2005, DC Me) 370 F Supp 2d 331, affd (2005, CA1 Me) 433 F.3d 31

Court did not have to consider defendant's double counting objection to offense level enhancement imposed under USSG § 2A6.2(b) because (1) defendant had pleaded guilty to interstate violation of protective order under **18** USCS § **2262**; (2) **18** USCS § **2262**(b)(5) established maximum five year term for offense; (3) § **2262**(b)(5) trumped any greater sentencing guideline range that was applicable under federal sentencing guidelines; and (4) court did not have to consider objection because guidelines range that defendant faced, following imposition of USSG § 2A6.2(b)(1)(D) enhancement, was 63-78 months' imprisonment, which exceeded maximum term that defendant could receive under **18** USCS § **2262**(b)(5). United States v Robinson (2005, DC Me) 370 F Supp 2d 331, affd (2005, CA1 Me) 433 F.3d 31

§ 2263.    Pretrial release of defendant

In any proceeding pursuant to section 3142 [18 USCS § 3142] for the purpose of determining whether a defendant charged under this chapter [18 USCS §§ 2261 et seq.] shall be released pending trial, or for the purpose of determining conditions of such release, the alleged victim shall be given an opportunity to be heard regarding the danger posed by the defendant.

(Added Sept. 13, 1994, P. L. 103-322, Title IV, Subtitle B, Ch 2, § 40221(a), 108 Stat. 1928.)

How can you gave this when the Defendant was not gaven any kind of
of protective order under 18 USCS §2262 (2)  and how can you gave
18 USCS §2262 (b) (5) established maximum five year term for offense;
(3) § 2262(b)(5) trumped any greater sentencing guideline range that
applicable under federal sentencing guidelines; and (4) court did
not have to consider objection because guidelines range the defendant
face, following imposition of USSG §2A.6.6(b)(1) (d) enhanement was
63-78 month's
imprisonment, which exeeded maximum term that defendant could receive
under 18 USCS §2262(b)(5).

Now under 2G1.3 (b) (2) (b) for "unduly influencing and ther only
being a undercover officer. and ther can't be any Victim ther should
not been a protective order. and the defendant should have paper
work showing, such ꞯꞯꞯꞯ·order.

Smith Haine, Attorney                                      8/25/2011
519 N Newnan St
Jacksonville, Fl 32202


Mr Haine;

I'am contacting your firm since you were my Defense Counsel.
I'am trying to get my case review under Amendment 732 was cla-
nifying that should have been apply retoractively. thus the
two-level enhancement did't apply when the only ( minor)
involved was a undercover officer. When I ask you to apply my
case you told me No. your action cause me, the difendant the
ability to appeal my case. My No is 3:07-OR-107-J-33-MCR. one
count 18:2422(b) and two- count 2252(A) & 2252(b). for me to
do this I need the Following Docments;
1. A copy of the indictment;
2. A copy of the Judgment and Commitment Order;
3. A copy of the Presentence Inverstigation Report (PSI).
4. A copy of the Sentencing Memorandum by the Defense counsel
   objecting to the presentence report and all government
   responses;
5. A copy of the plea transcipt;
6. A copy of the plea agreement;
7. A copy of the sentencing transcipt;
8. All appellate pleadings, opinions, and any other collateral
   Pleadings ( if applicable);
9A list of any question or concerns?

1. questions; did  the defense ask you to you with in the 10 day
   guideline to appelly this sentencing? and dwhat was your
   answer?
I will be wateing for your answer to this letter!

                                          Sincerely;

Bobby Hibbs 26463-001
F.C.I.
P.O.Box 9000
Seagoville, Tx 75159

The claim that counsel was ineffective for failing to file an appeal as directed. While the inmate and his attorney disagreed about the number of times they met throughout the course of the representation, it was undisputed that the attorney didn't advised the inmate of his appellate rights after the court notified the inmate to his right to appeal. the content of the exchange in the case did not constitute adequate consultation. Simply asserting the view that an appeal would not be successful did not constitute consultation in any meaningful sense. When you told me that it was within the judge right. and You told me "No" that you would not appeal! The inmate told the attorney that he was dissatisfied with his sentence. the inmate call his attorney with 5day of his sentence and directed his attorney to file appeal. the attorney had a clear duty to the Deficient. The Deficient met his burden of showing the requisite prejudice. that an attorney who fails to file an appeal on behalf of a client who specifically requests it acts in a professionally unreasonable manner per se. Moreover, counsel generally has a duty to consult with the defendant about an appeal.. and then it was up to the attorney to make a reasonable effort to pursue an appeal. You smply asserting the view that an appeal would not be surfcessful dose no constitute consultation in any meaningdul sense. I have file a claim whether there was adequate consultation about an appeal as a matter of law. Counsel has a constitutional duty to cansult with a defendant about an appeal when.

1.Any ratiional defendant would want to appeal, I did abcause I ask you to!

2. the defendant reasonably reasonably demonstrated and interest in appealing. In order to establish that he was prejudiced by counsel's failure to filean appeal. a petitioner must show that there is a reasonble probability that. but for Counsel's deficient failure to appeal. he would not have timely appealed right. so because of the attorney action the defendant could not appeal a federal conviction is a matter given to him by law.

this claim has been file with the federal public deficient office in Washington DC

and since you have not answer any of my letter. I'am file my case back in court under Amendment 732 and a copy of this letter is being sent to the United states Attorney office middle district Fl in Tanpa, Fl

⇔26463-001⇔
United States Attorneys
500 W ZACK ST
Office Middle District FL
Tampa, FL 33602
United States

⇔26463-001⇔
Federal Publia Defenders
625 Indiana AVE NW
Office # 550
Washington, DC 20004
United States

⇔26463-001⇔
National Bar Assn
1225 11TH ST NW
Washington, DC 20001
United States

Case No 3:07-CR-107-J-33-MCR:

att Emticement of Minor for sexeal activity by used of computer/

Transport of child Pornography:

2A3.4

2G2.2

2A3.4

3D1.2

3D1.2 (c)

18 U.S.C 1466 A(b) 2252(a)(4) 2252(a)(5)

Criminal History Category. II points.

2G2.2(b)(3)(D) + 6

2G2.2(b)(6) +5

2G2.2(b)(5) +2

2G2(b)(7)(a) 10 to 150 image +2 deficient had 85 image +2

U.S.S.G. 3E1 (a)(b) - 1

do you see anything wrong with this?

why did I get two more level than I should had for image?

why did i get 7 leverl for the same thing under 2G2.2(b)

why is ther two 2A3.4 ?

is 3D1.2 the same thing ?

Is it true that you got a bonus of $3,000 if you got a guilty plea
and it didn't go to trial?

*Copy*

While U.S. Sentencing Guidelines Manual § 2A3.2 (2003) specifically defines "victim" to include undercover agents posing as underage children for purposes of interpreting the language of § 2A3.2, this definition should not apply in provisions in which such a definition does not make sense. Section 2A3.2(b)(2)(B) is not the only section of § 2A3.2 in which interpreting "victim" to include an undercover agent would require a distorted or illogical reading of the Sentencing Guidelines. Section 2A3.2(b)(1) provides for a two level enhancement where the victim was in the custody, care, or supervisory control of the defendant. Although ostensibly the Sentencing Guideline definition of "victim" applies to § 2A3.2(b)(1) as well, it is impossible to conjure a situation in which "victim" in this context could be fairly read to include an undercover agent. Only by altering the meaning of § 2A3.2(b)(1) could this provision possibly apply where the victim is an undercover agent. The same reasoning applies to § 2A3.2(b)(2)(B).

© 2011 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

at the prior sentencing. *Pepper v. U.S.*, 131 S.Ct. 1229 (Mar. 2, 2011).

**Supreme Court rules that law-of-the-case does not restrict sentencing on remand.** On defendant's appeal of his sentence, the court of appeals vacated the sentence and ordered that the case be reassigned to a different district judge on remand. On remand, the new judge held that she was not bound by the prior judge's decision to reduce defendant's sentence by 40 percent below the Guidelines range based on the defendant's substantial assistance to the authorities. Instead, the judge found that defendant was entitled to only a 20-percent reduction. Defendant argued that the law-of-the-case doctrine barred the district court from reducing defendant's sentence by less than 40 percent from the Guidelines range. The Supreme Court, in a decision by Justice Sotomayor, held that the law-of-the-case doctrine did not require the district court to apply the same percentage departure from the Guidelines range for substantial assistance that had been applied at defendant's prior sentencing. *Pepper v. U.S.*, 131 S.Ct. 1229 (Mar. 2, 2011).

#### HABEAS CORPUS/28 U.S.C. 2255 MOTIONS

**Supreme Court holds that motion for reduced sentence tolls limitations period.** Under 28 U.S.C. §2244(d)(2), a properly filed application for state "post-conviction or other collateral review" tolls the one-year limitations period for filing a federal habeas petition challenging a state conviction. Defendant was convicted in Rhode Island state court on 10 counts of first-degree sexual assault and sentenced to consecutive life terms of imprisonment. He filed a motion under Rhode Island law seeking a reduction of that sentence. After the trial court denied that motion, defendant filed a federal habeas petition. In a decision by Justice Alito, the Supreme Court held that a motion to reduce sentence under Rhode Island law was a petition for "collateral review" that tolled the one-year limitations period. *Wall v. Kholi*, 131 S.Ct. 1278 (Mar. 7, 2011).

**11th Circuit holds that Rule 35(b) did not reset limitation period for filing §2255 motion.** Defendant was sentenced in 2004 on drug charges. In 2007, the government moved pursuant to Rule 35(b) to reduce defendant's sentence. The court granted the motion and reduced defendant's sentence from 90 months to 66 months. Three months after the court granted the government's Rule 35(b) motion, and over three years after the time for appealing the 2004 judgment had expired, defendant moved the district court under §2255 to vacate his sentence, claiming ineffective assistance of counsel. In the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Congress created a one-year statute of limitations for §2255 motions. The relevant date here was the date on which the judgment of conviction became final. The Eleventh Circuit held that

the reduction of defendant's sentence under Rule 35(b) had no impact on the limitation period for defendant's motion to vacate. A Rule 35(b) modification does not constitute a new judgment of conviction that restarts §2255's statute of limitations clock. *Murphy v. U.S.*, 634 F.3d 1303 (11th Cir. March 8, 2011).

*From the Federal Sentencing Guide:*
Vol. 22, No. 3, January 31, 2011
Vol. 22, No. 4, February 14, 2011
Vol. 22, No. 5, February 28, 2011
Vol. 22, No. 6, March 14, 2011
Vol. 22, No. 7, March 28, 2011
Vol. 22, No. 8, April 11, 2011
Vol. 22, No. 9, April 25, 2011

### *Padilla* Applies to Sex Offender Registration

- *State v. Fonville*, 2011 Mich. App. LEXIS 140 (Mich. App. 2011) (applies *Padilla* reasoning to sex offender registration).
- *Taylor v. State*, 698 S.E. 2d 384 (Ga. App. 2010) (potential ineffective assistance for failing to advise re sex offender registration, but not participation in treatment program).
- *In re C.P.H.*, 2010 N.J. super, Unpub. LEXIS 1721, No. FJ-03-1313-02, 2010 WL 2926541 (N.J. Super. Ct. App. Div. 2010) (ineffective assistance in failing to advise juvenile re lifetime sex offender registration).
- *State v. Edwards*, 141 N.M. 491, 499 (2007) (ineffective assistance failure to advise re SORNA registration grounds for vacating plea).

## ARRESTED OR INDICTED BY THE FEDS
### *The Federal Criminal Law Center*

**MITIGATING THE OUTCOME OF YOUR CASE FROM THE BEGINNING:**

- **Bond, Illegal Search, Trial, Plea,**
- **PSR Objections, Sentencing Variance & Departures**
- **Appeals from Trial, Plea & Sentencing**

**Helping you navigate the troubled waters of the Federal Criminal Justice System**

**www.federalcriminallawcenter.com**
**www.federalappealslawyer.com**

at the prior sentencing. *Pepper v. U.S.*, 131 S.Ct. 1229 (Mar. 2, 2011).

**Supreme Court rules that law-of-the-case does not restrict sentencing on remand.** On defendant's appeal of his sentence, the court of appeals vacated the sentence and ordered that the case be reassigned to a different district judge on remand. On remand, the new judge held that she was not bound by the prior judge's decision to reduce defendant's sentence by 40 percent below the Guidelines range based on the defendant's substantial assistance to the authorities. Instead, the judge found that defendant was entitled to only a 20-percent reduction. Defendant argued that the law-of-the-case doctrine barred the district court from reducing defendant's sentence by less than 40 percent from the Guidelines range. The Supreme Court, in a decision by Justice Sotomayor, held that the law-of-the-case doctrine did not require the district court to apply the same percentage departure from the Guidelines range for substantial assistance that had been applied at defendant's prior sentencing. *Pepper v. U.S.*, 131 S.Ct. 1229 (Mar. 2, 2011).

**HABEAS CORPUS/28 U.S.C. 2255 MOTIONS**

**Supreme Court holds that motion for reduced sentence tolls limitations period.** Under 28 U.S.C. §2244(d)(2), a properly filed application for state "post-conviction or other collateral review" tolls the one-year limitations period for filing a federal habeas petition challenging a state conviction. Defendant was convicted in Rhode Island state court on 10 counts of first-degree sexual assault and sentenced to consecutive life terms of imprisonment. He filed a motion under Rhode Island law seeking a reduction of that sentence. After the trial court denied that motion, defendant filed a federal habeas petition. In a decision by Justice Alito, the Supreme Court held that a motion to reduce sentence under Rhode Island law was a petition for "collateral review" that tolled the one-year limitations period. *Wall v. Kholi*, 131 S.Ct. 1278 (Mar. 7, 2011).

**11th Circuit holds that Rule 35(b) did not reset limitation period for filing §2255 motion.** Defendant was sentenced in 2004 on drug charges. In 2007, the government moved pursuant to Rule 35(b) to reduce defendant's sentence. The court granted the motion and reduced defendant's sentence from 90 months to 66 months. Three months after the court granted the government's Rule 35(b) motion, and over three years after the time for appealing the 2004 judgment had expired, defendant moved the district court under §2255 to vacate his sentence, claiming ineffective assistance of counsel. In the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Congress created a one-year statute of limitations for §2255 motions. The relevant date here was the date on which the judgment of conviction became final. The Eleventh Circuit held that

the reduction of defendant's sentence under Rule 35(b) had no impact on the limitation period for defendant's motion to vacate. A Rule 35(b) modification does not constitute a new judgment of conviction that restarts §2255's statute of limitations clock. *Murphy v. U.S.*, 634 F.3d 1303 (11th Cir. March 8, 2011).

*From the Federal Sentencing Guide:*
Vol. 22, No. 3, January 31, 2011
Vol. 22, No. 4, February 14, 2011
Vol. 22, No. 5, February 28, 2011
Vol. 22, No. 6, March 14, 2011
Vol. 22, No. 7, March 28, 2011
Vol. 22, No. 8, April 11, 2011
Vol. 22, No. 9, April 25, 2011

## *Padilla* Applies to Sex Offender Registration

- *State v. Fonville*, 2011 Mich. App. LEXIS 140 (Mich. App. 2011) (applies *Padilla* reasoning to sex offender registration).
- *Taylor v. State*, 698 S.E. 2d 384 (Ga. App. 2010) (potential ineffective assistance for failing to advise re sex offender registration, but not participation in treatment program).
- *In re C.P.H.*, 2010 N.J. super, Unpub. LEXIS 1721, No. FJ-03-1313-02, 2010 WL 2926541 (N.J. Super. Ct. App. Div. 2010) (ineffective assistance in failing to advise juvenile re lifetime sex offender registration).
- *State v. Edwards*, 141 N.M. 491, 499 (2007) (ineffective assistance failure to advise re SORNA registration grounds for vacating plea).

**ARRESTED OR INDICTED BY THE FEDS**
**\*The Federal Criminal Law Center\***

**MITIGATING THE OUTCOME OF YOUR CASE FROM THE BEGINNING:**

- **Bond, Illegal Search, Trial, Plea,**
- **PSR Objections, Sentencing Variance & Departures**
- **Appeals from Trial, Plea & Sentencing**

**Helping you navigate the troubled waters of the Federal Criminal Justice System**

**www.federalcriminallawcenter.com**
**www.federalappealslawyer.com**

The definition of "unduly" is without due cause or justification; without proper regard to right and wrong; unrightfully, improperly. The definition of "influence" is to exert influence upon, to affect by influence; to affect the mind or action of. The dictionary definition of "undue influence" suggests, by its reference to affecting the mind or action of another, that there must be an actual person who is affected in some way. An undercover law enforcement officer who is not at all persuaded in thought or in deed, therefore, cannot be "unduly influenced." Thus, the plain language of U.S. Sentencing Guidelines Manual § 2A3.2(b)(2)(B) (2003) indicates that the two level enhancement should not be available in cases involving undercover agents rather than actual minors.

© 2011 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

## Collateral Effects of Guidelines Sentencing

Changes in sentencing law and policy can explain the sixfold increase in the national prison since the early 1970's the mechanical approach to sentencing of the federal defendant, effectuated by the enactment of the guidelines, has gradually eliminated considerations as to the individuality of the particular defendant. by being pigenholed into a specific guideline range, defendants are no longer treated as individuals but as case number.

Treating a defendant as a number rather than a human-being has resulted in some distubing decisions. For example, one case saw a refusal to depart where the defendant was 55 years old, suffered from high blood pressure, had cancer (in remission) had a drug dependency, and had an ampitated leg. Although some might suggest that the Bureau of prisons can handle such medical problems, research suggesta otherwise. Medical treatment in prison is Substandard at best. As a result of severe sentences, our prison popualation is becomeing geriatric, and the medical needs of an aging prison population smiply are not being met... while the war on drug and sex related crimes has not slowed the influx of federal prisoners into the system, the harsher federal penalties have worked to keep prisoners incarcerated longer. The sentencing guidelines have contributed ti lengthier prison sentences for people charged with federal crimes. Justice Kennedy said in his speech to the ABA opening assmbly: " It is no defense if our current prison system is more product of neglect than of purpose.... Out of sight, out of mind is an unacceptable excuse for a prison system...While prison issues should be studied further, " it dose seem justified to say this: Our resources are misspent, our punishment too severe, our sentences to long".

Exhibit 1

## AFFIDAVIT

STATES OF TEXAS )
COUNTY OF DALLAS )

Affiant: Bobby Hibbs
        Reg. No. 26463-001
        F.C.I. Seagoville
        P.O. Box 9000
        Seagoville, Texas
        75159-9000

---

I, Bobby Hibbs, Affiant pro se, hereby swear the following
account regarding my treatment at F.C.I. Seagoville by Dr. Capps,
Mr. McGauh, Ms. Fernanders, MLP Caramines and other unnamed staff
in the Health Services Unit (HSU) is true and correct to the best
of my recollection and knowledge:

1)   On September 25, 2009, about 8:20am, I was told at work in
CMS that my right eye was red. Miss Davis from CMS called medical
from 8:20am to about 8:30am before she reached Dr. Capps. I was
told to be there to medical but found a note that all appointments
were cancelled for today. But since I am blind in my left eye, I
remained there to see someone. Dr. Capps came out of his office
at about 12:40pm, I told him my name, he told me to sit down. At
1:45pm one of the PA's Mr. Camarines was in the hall. I was talking
with him about my eye. I told him my name, he told me that Dr. Capps
wanted to talk to me about my eye. On that day medical was closed
down at 2:00pm. We went into his office and he looked at my eye
and prescribed (Naphazoline/Pheniramine) for itching/redness eye
allergy relief. But by the time he was done, the electric power
went out and the prescription could not be filled until September

28, 2009. At 1:54pm MLP Mr. Camarines told me to come back on the 28th of September and he would get me the medicine.

2)    On September 28, 2009 when I saw Mr. Camarines I asked him about what time on the 25th of September did Mr. Capps ask him to see me? He told me it was about 9:30am, but Dr. Capps did not say anything about it when I talked to him on the 25th of September at 12:40pm when he saw me. (See Exhibit A)

3)    Wednesday October 1, 2009 I went to sick call and was told by the Assistant Administrater Miss E. Fernanders that there was no sick call on Wednesday's which I already knew this, but I told her my right eye was burning and that I am blind in my left eye. She told me she did not care what was wrong with my eyes and to come back on Thursday October 2, 2009. By that time I had to have someoe walk me over to medical because my eye was burning so bad I could not see. The MLP that saw me was A. Nguyen. He ordered (Gentamicin Ophth Soln 0.3%) but did not flush my eye out at all. I was told to keep using the (Naphozoline/Pheniramine Ophth) but not at the same time.

4)    On October 9, 2009 I went to pill-line on Friday night at 7:00pm. I was told by R.N. Gifford that there was nothing she could do for me. That Saturday morning on October 10, 2009 I went to the Lt's office about my eye and was told there to see MLP today or on Sunday October 11, 2009. So they had someone walk with me so I could go eat and get back to my unit.

5)    October 12, 2009 was Columbus Day, no sick-call, so for three days now I did not get any help.

6) October 13, 2009 I went back to sick call about my right eye. I talked with MLP Mr. Camarines and was told to return immediately if my condition gets any worse.

7) October 22, 2009 I still have eye problems but I was told to keep using both medicines.

8) Sunday October 25, 2009 I went back to medical and needed to be assisted by a fellow inmate to get over there to medical and back to my unit. My right eye burned so bad that I could not even open it at all. When I did open it it hurt. I was told by MLP Mr. Camarines to stop taking the Gentamicin and the Naphcon and was put on a medicine called artificial tears and was told sick-call was Monday at 6:00am.

9) October 25, 2009 I was sent by the unit officer over to medical for evaluation at 8:00pm and was told sick-call is at 6:00am on Monday by R.N. Gifford.

10) October 26, 2009 I was seen by MLP Mr. Camarine at 12:14pm and was told to stop taking "artificial tears" because my progress had gotten worse and I was put on the medicine called Diclofenac Sodium Ophth for pain but used it for only three days. The third day was a Wednesday since there was no sick-call I had to talk with the pharmacy and was told to keep using it. I came back to sick-call on October 29, 2009 but at 3:16pm on October 27, 2009 it was put in for me to see a opthalmologist for consult. This I did not know until I asked for my medicine information. It was put down as "routine" were it said "priority."

11) October 29, 2009 I went to sick-call and was told to keep using the Diclofenac for pain until November 1, 2009. I came back on Monday November 2, 2009 and was told on that day to stop taking all eye medicine because I was to be sent out to a opthalmologist. I was taken to the opthamologist on November 10, 2009.

12) November 10, 2009, Dr. Potasznik, the opthalmologist that I was seen by told me that I had a damaged retinal in my right eye and I also have glaucoma. By the time we got back it was 11:45am and pill-line is at 2:50pm. The new medicine that I put on was called Travatan and I was to put one drop in my eye only once every night. When I went back to pick it up I was told that I could not have it because Dr. Capps had to approve of it first and he was gone for the day. My prescription was not filled until November 12, 2009 when Dr. Capps answered my cop-out stating that my medicine was not urgently needed. I also was seen by Dr. Capps that very same day and I was told by him the "Just because I am blind in one eye and can't see out the other that doesn't make me special". (See Exhibit B)

13) January 15, 2010 I sent a cop-out to Mr. McGaugh informing him to keep up on my eye care and to report all of my care down on record for the future. (See Exhibit C)

14) I went and saw the BOP eye doctor who does the eye exams for the inmates on February 7, 2010, we talked for about 1 hour. As he checked out my eye he said none of this with my right eye happened before I got here or he would have seen it when he did my eye exam for my prescription for my glasses. With my prescription my sight was 20/20 in my right eye, now it is 20/25 + 1. He said that was not a lot but in my case it is because anything with a - in it can

-4-

be fixed with prescription glasses, but with a +, that is sight I
have lost. The eye doctor even asked me why did the staff not ask
him to look at my eye within those 47 days because he is there two
times a month. Before I went back to my unit he went to the pharmacy
with a prescription and when I was told I could get it the next day
because there was retinal hemorrhage in my right eye.

15) On February 8, 2010, I went to get my prescription at 2:50pm
and was told that it had to be OK'd by an MD or a PA from the BOP.
I went to talk with Ms. Fernanders the assistant health care
administrator and the first thing she said was there is no sick-call
on Wednesday. After I told her what was going on and why I need
the prescription and what doctor wrote it she told me to come over
the next day at 8:30am and to let her know again what I was there
for and she would see that it got filled or that I could talk with
a MLP or a MD.

16) On February 9, 2010 I went back to health care as I was told,
it was 8:30am and the door was locked. When I did get someone to
come to the door, Mrs. Gifford the RN told me there was an inmate
from the camp in there and for me to come back later. At 12:30pm
I again talked with Ms. Fernanders at main-line about my prescription
and she said that she talked to MD Capps and he did not know anything
about it. Again I told her it was the doctor who did the eye exams
for the inmates who wrote the prescription and she said he was here
today and she would look into it again. I went back again at 2:50pm
and still no prescription. I talked with the pharmacy and he said
it still had not been filled and that none of the paperwork had been
done in oreder for him to fill the prescription. He told me that

Ms. Fernanders was still there so I again went to talk with her. She asked me what did I want and I told her I would like my prescription for my eyes. She got mad and told me that she had gotten someone to take care of it and I said I guess not because the pharmacy still needed the paperwork in order to fill it. By 4:00pm that day it was filled.

17) On February 15, 2010 I wrote a request to staff to the safety manager regarding my experience from September 25, 2009 to November 10, 2009. I explained my job function and safety replied they would conduct an investigation. They would not let me see the report he got from medical and further told me that safety ~~knew~~ ᴰⁱᵈⁿᵗ ᵏⁿᵒʷ what happened. (See Exhibit D)

18) In March I wrote Dr. Potasznik a note asking the diagnosis, treatment and progress of the injury and damage to my right eye. There was no answer. (See Exhibit E)

19) On March 8, 2010, I wrote Dr. Capps about my skipped appointment that he neglected to schedule me for. He did not respond until after he rescheduled for March 10, 2010. (See Exhibit F)

20) On March 15, 2010, I received a letter from "The Joint Commission" informing me of what I needed to do remedy my concerns. (See Exhibit G)

21) On MArch 16, 2010, I wrote to Dr. Capps asking the information the Joint Commission suggested I obtain. The following day I met Dr. Capps in the hall and he referred me to the doctor that saw me or refer to the records. He seemed upset that I sent him the cop-out I sent. (See Exhibit H)

-6-

22) On March 18, 2010, I wrote to Dr. Capps with my concern of taking the alergy tablets because of the warning about using them after being diagnosed with glaucoma. I informed him of the inattention I was given and received no response. (See Exhibit I)

23) On May 13, 2010, Mr Coll wrote a letter informing me he referred my concerns back to the warden, again refusing to review my case. (See Exhibit J)

24) On May 10, 2010 I sent a letter to Mr. Coll informing him of my dissatisfaction with his letter. (See Exhibit K)

## CONCLUSION

I am still sending cop-outs to get answers about my concerns, my questions and am trying to set up an appointment to have my eyes checked for (IOP) intraocular eye pressure for any more loss of sight since taking the allegery relief. I have stopped taking them.

**Additionally Affiant Sayeth NAUGHT.**

Bobby Hibbs

State of Texas )
County of Dallas )

Subscribed and sworn before me on the _____ day of
_____, 2010.

Notary Public

My Commission Expires



**U.S. Department of Justice**
**Office of the Inspector General**
Investigations Division
Dallas Field Office
2505 N. Hwy. 360, Suite 410, Box 21
Grand Prairie, Texas 75050
Phone (817) 385-5200
Fax (817) 385-5206

September 30, 2010

**MEMORANDUM**

**TO:**     Chief John T. Dignam
Federal Bureau of Prisons
Office of Internal Affairs
Washington, D.C.

**FROM:**           (b)(6)&(b)(7)(c)

Dallas Field Office

**SUBJECT:**    Unknown BOP Staff

Attached is further information relating to OIG Complaint No. 2010-009038, which was referred to your office on or about August 11, 2010.

If you have any questions concerning this matter, please contact me at    (b)(6)&(b)(7)(c)

Attachment



**U.S. Department of Justice**

**Federal Bureau of Prisons**

Washington, D.C. 20534

October 8, 2010

MEMORANDUM FOR M. CRUZ, WARDEN
                FCI SEAGOVILLE, TX

FROM:       John Dignam, Chief
            Office of Internal Affairs

SUBJECT:    OIA Complaint No. 2010-C-01691

Attached is additional information related to the above referenced complaint, which was originally forwarded to your office by memorandum dated August 23, 2010.

Please contact us with any questions or concerns.  Your support and cooperation are appreciated.

Attachment

10/8/10 (b)(6)&(b)(7)(c)

*__SBU__ - Sensitive But Unclassified*

Augs 23,2010

Dear Sir:

On tusday augs 17, 2010. I went to sick call about my
eyes hurting, I told the Rn that it fell some one was pushing
real hard on the back of my eyes. He made me a appointment
for augs 20, 2010 at 8:30 when I did get to see someone about
10:20am it was one of the new PA for the B.O.P. I told him
what was wrong with my eyes, he told me that my situation
with my eyes was beyond the scope of his expertise. And
·after looking he saw that it has been approved by the (URC ).
that is the Utilization Review Committee: They determine the
final disposition of the following requests: such requests
as Consultants/ Specialists: since Nov 10, 2009 I have been
sent out to see a Ophthalmologist about my eyes. As I was
talking with the PA, Dr Capps came in and ask me how my eye
sight was I told him it was now at 20/30 ·+1. I told him
that Iwas loseing sight in my right eye. Dr Capps and the PA
talk about me going out to see the Ophthalmologist and
said it be sometime in Sept. I ask what should I take for
for pain. The new PA said that ther was not anything that
he could gave me for pain. I would have to wait to see
the eye doctor sometime in Sept to get something done for
pain. At no time did the PA call the Ophthalmologist to see
if ther was anything to take ‾ for pain.

I have been going out to the ophthalmolgist every 6 to 8 wk,
but each time I go to sick call , I get the same thing from
staff here. what do you want us to do. you are going out every
6 to 8 wk . So dose that make it ok to refused to gave
treatment in which would help relieve the pain. This not
the first incidents that has happen to me here at F.C.I.
Seagoville. With what happen on 8/20/2010 . The staff know
that ther is no other place to get treatment so we have
accept whatever treatment they sadistically chose to offer.
I know in here I just can't just choose my treatment. But
once in treatment I have the right to adequate treatment.
It is the doctor and the staff duty to prescribe treatment
and medications. And if they knew or should have know that
constitutional violation was occurring. they should have
done more than what they did. should they be liability for
what they did. From all of this from Sept 09 to now.
I have been told this a permanent injury to my right eye
and I'm going to keep loseing sight in it. I belive I can
show " Deliberate neglect" with what they are doing here.
could you look into this matter.

        Director of General Counsel F.B.P.
Cc..  ----------
cc: Commission on Civil Rights              SINCERELY

Bobby Hibbs- 26463-001                     M̶̶Ḣibb
F.C.I.
P.O.Box 9000
Seagoville, Tx 75159-9000

Evidence that a medical provider violated written policies was relevant to determining the provider's liability for a detainee's suicide. It showed that the provider was on notice that its employees ignored the medical needs of prisoners. Its practice of failing to act in the face of known violations of its written policies was relevant circumstantial evidence showing the provider's knowledge and state of mind.[89]

*I can show, you violated written policies ??*

© 2010 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

competent prisoners to supplement the above minimal civilian **medical** staff.[52] As in most "treatment" cases, the lack of funds has not been recognized as a defense or excuse.

ther no defense or excuse,
to give poor Medical Care.

© 2010 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

*Estelle v. Gamble*.[61] In that case, the Supreme Court reasoned that there must be facts and evidence to show a deliberate indifference to serious **medical** needs. Thus, simple neg-ligence will not be sufcient to obtain a judgment against prison **medical** or security staff for inadequate treatment as a constitutional violation. The lack of **medical** treatment must be intentional; an accident or inadvertent failure to provide proper **medical** **care** is insufto meet the Supreme Court's stan-dard of deliberate indifference to serious **medical** needs. It should be noted, however, that negligence may be actionable in state courts under state law.

*I*

*I*

Constitutional Rights of Prisoners                    1

© 2010 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

**a.** **Medically Necessary - Acute or Emergent.** Medical conditions that are of an immediate, acute or emergent nature, which without care would cause rapid deterioration of the inmate's health, significant irreversible loss of function, or may be life-threatening.

Examples of conditions considered acute or emergent include, but are not limited to:

- myocardial infarction;
- severe trauma such as head injuries;
- hemorrhage;
- stroke;
- status asthmaticus;
- precipitous labor or complications associated with pregnancy; and
- detached retina, sudden loss of vision.

Treatment for conditions in this category are essential to sustain life or function and warrant immediate attention.

**b.** **Medically Necessary - Non-Emergent.** Medical conditions that are not immediately life-threatening but which without care the inmate could not be maintained without significant risk of:

- serious deterioration leading to premature death;
- significant reduction in the possibility of repair later without present treatment; or
- significant pain or discomfort which impairs the inmates participation in activities of daily living.

Examples of conditions considered medically necessary,

© 2010 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



# Operations Memorandum

1. <u>PURPOSE</u>: To include in Bureau of Prisons policy certain basic policies related to incarceration.

2. <u>BACKGROUND</u>: In many policies, since cancelled or updated, basic statements related to treatment of inmates were provided. These statements were necessary to meet accreditation standards and to affirm our continuing humane treatment of inmates.

   Inmates are sentenced to confinement as punishment; they are not confined for punishment except as provided for by law and regulation. Hazing, harassment, <u>unnecessary restrictions and deprivations and demeaning treatment serve no useful purpose and are prohibited</u>. The friction they cause creates tension between staff and inmates and leads to acts of aggression, retaliation, and serious individual or mass disturbances. Offenders forced to comply with unreasonable and unnecessary routines lose respect for the authority which imposes them.

3. ACA Standards C2-4053 and C2-4172 are referenced.

4. No inmate or group of inmates is authorized to have control or authority over other inmates. <u>Inmates are also to be protected from</u> personal abuse, corporal punishment, personal injury, disease, property damage and <u>harassment</u>.

5. Questions about this Operations Memorandum may be referred to the Chief, Correctional Services, Central Office.

6. The provisions of the OM will be included in the next update to the Correctional Services Manual.

Patrick R. Kane, Assistant Director
Correctional Programs Division

INMATE REQUEST TO STAFF CDFRM

U.S. DEPARTMENT OF JUSTICE                    FEDERAL BUREAU OF PRISONS

| TO:(Name and Title of Staff Member) | DATE: |
|---|---|
| Manual Emriquez | 8/15/ 2011 |
| FROM: Bobby Hibbs | REGISTER NO.: 26463-001 |
| WORK ASSIGNMENT: Paint shop | UNIT: B-53 |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary.  Your failure to be specific may result in no action being
taken.  If necessary, you will be interviewed in order to successfully respond to your
request.
    You and I talk on August 11, 2011 that you were going by the april 10,
2011 report from the Retina Institute of tx. that his office didn't need a
follow up. unless ther sings of sympotoms of ritinal tear of delacment
with me. and he explaned that the flashie in the right eye may be the
result of an impending poslerio Viteous delachtemt. and I should notily you.
immedialely should I develop new on set flmtied , flashes or pexipheral
Visual field defects. And since you can't fine any paper work from Dr
Potasnik showing a follow up viset since 10/13/2010 and I have a
health report with a date 2/3/2011 say follow up in four month, and
next pg

(Do not write below this line)

DISPOSITION:

You may access medical care by attending sick call to notify
the healthcare practitioners of any changes regarding your
chronic health conditions. Recommendations can be made,
at that time for any additional evaluations concerning
your eyes Additionally, any medical care regarding your
hernia which may be required will be based on the opinion
after your evaluation is performed by the specialist.
As you are aware we can not provide you with the date of
the evaluation by the recommended specialist.

| Signature Staff Member | Date 8/23/11 |
|---|---|

Record Copy - File; Copy - Inmate
(This form may be replicated via WP)

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR PRIVACY FOLDER          SECTION 6

This Operations Memorandum:
No 151-90(5510)

Show were the inmate was sentenced to confinement as Punishment;
THEY ARE NOT CONFINED FOR PUNISMENT, except as provided for by law
and regulation.

1. Hazing;
2. Harassment;
3. Unnecessary restrictiions;
4. Deprivations;
5. Demenaning treatment;

SERVE NO USEFUL PUPOSE AND ARE PROHIBITED.....
but they still do them to punishment to the inmate.
Inmate are also to be protected for personal abuse, corporal punis-
hment, personal injury, disease, property damage, harasssment.
 Now would protected form personal abuse, fall under good medical
care and show demeaning treatment by mediacl staff. and they harassment
and deprivation you of good health care. would that not be call
punishment.!!!!!!!!!!

# Retina Institute
# of Texas, PA

MAURICE G. SYRQUIN, M.D.
GREGORY F. KOZIELEC, M.D.
MARCUS L. ALLEN, M.D.
S. ROBERT WITHERSPOON, M.D.

VITREOUS AND RETINA
DIAGNOSIS AND SURGERY
PROFESSIONAL ASSOCIATION

3414 OAK GROVE AVENUE • DALLAS, TEXAS 75204
214-521-1153 • 214-219-3651 FAX • 1-800-442-5376

BAYLOR HEALTH CENTER PLAZA I
400 W. INTERSTATE 635 • SUITE 320 • IRVING, TEXAS 75063
972-869-1242 • 972-869-2921 FAX • 1-888-222-2199

USMD HOSPITAL AT ARLINGTON
811 W. INTERSTATE 20 • SUITE 26 • ARLINGTON, TEXAS 76017
817-417-7769 • 817-417-7405 FAX • 1-800-640-4984

3331 UNICORN LAKE BOULEVARD • DENTON, TEXAS 76210
940-381-9100 • 940-381-9106 FAX • 1-888-381-9199

April 10, 2011

Joseph R. Capps, M.D.
Federal Correctional Institute
2113 North Highway 175
Seagoville, TX 75159
Phone: 972-287-4095
Fax:   972-287-6769

RE:    Bobby Hibbs
       MR#:  40791
       DOB:  03/17/1950
       DOV:  03/30/2011

Dear Dr. Capps:

I had the pleasure of seeing Mr. Bobby Hibbs for a retina evaluation on March 30, 2011, through the courtesy of your kind referral. As you recall, Mr. Hibbs is a very nice 61-year-old gentleman who has been blind in the left eye since birth. He has a history of marked prematurity at birth. He has had cataract surgery performed to the right eye, and he currently uses glaucoma drops including Xalatan. He currently complains of flashes in the right eye for a few months.

Today, his vision without correction was 20/25 on the right and no light perception on the left. The intraocular pressures were 16 and 25, respectively. Anterior segment examination of the right eye revealed a posterior chamber intraocular lens. On the left, there was aphakia.

On dilated ophthalmoscopy of the right, there was mild vitreous degeneration, the disc was flat, and there was peripapillary atrophy. The macula and vessels were unremarkable. Peripheral examination revealed some lattice degeneration and scattered pigmentary changes, but no new retinal tears or detachments were seen.

On the left, a white large lens fragment is present in the inferior vitreous cavity, and the optic disc is pale. There were diffuse extensive pigmentary changes and chorioretinal atrophy throughout the fundus. B-scan ultrasonography revealed no subretinal mass or retinal detachment.

IMPRESSION:
1. Retinopathy of prematurity, both eyes.
2. No light perception, left eye.
3. Vitreous degeneration, right eye, no retinal tears or detachment.
4. Lattice degeneration, right eye.



RECEIVED
APR 1 1 REC'D
J. CAPPS, MD
CLINICAL DIRECTOR

RECOMMENDATIONS: I discussed today's findings with Hibbs. I explained that the flashes in the right eye may be the result of an impending posterior vitreous detachment. I emphasized the signs and symptoms of retinal tear or detachment with him. I asked him to notify you immediately should he develop new onset floaters, flashes, or peripheral visual field defects. I also explained that due to the no light perception in the left eye, there is nothing therapeutic that can be done to restore the vision.

Thank you again for the opportunity to see him, and I will be happy to see him at anytime in the future.

With cordial regards.

Sincerely,


Marcus L. Allen, M.D.

**Dictated but not read to expedite mailing.**

MLA:at9031
D: 04/10/2011 08:56:49 T: 04/10/2011 15:41:32 Job: 455915

**RECEIVED**

APR 11 REC'D

J. CAPPS, MD
CLINICAL DIRECTOR



# FAX

**April 13, 2011**

| To: LaShaunda | Phone: 972-287-4097 |
|---|---|
| Of: FCI Seagoville | Fax: 972-287-6769 |
| Re: Medical Records | # of pages including cover: 12 |

**MESSAGE:**

**Please see the attached medical records:**

**Patient:**     **Hibbs, Bobby**
**Appt:**        **Dr. Allen with Retina Institute of Texas**

**If you have any questions please don't hesitate to call me at 817-477-0400.**

**Best Regards,**

**Jared Landin**
**Account Manager**
**Integrated Medical Solutions, Inc.**

*Faxed by Nicole Wallace for Jared Landin*

RECEIVED

APR _ 8 REC'D

J. CAPPS, MD
CLINICAL DIRECTOR

*See letter also*

**PRIVACY NOTICE**
The information contained herein is protected health information. It is intended only for the use of the individual or entity named above. If the reader of this document is not the intended recipient, you are hereby notified that any distribution, dissemination, or copy of this document is strictly prohibited. If you have received this transmission in error please notify us immediately at 817-477-0400.

**99 Regency Parkway, Suite 307 * Mansfield, Texas, 76063 * Phone 817-477-0400* Fax 817-842-9058**



U.S. *Department of Justice*

*Federal Bureau of Prisons*

*Federal Correctional Institution*

*Seagoville, Texas   75159*

Date ~~7-6-09~~ 7-13-09

Inmate Name  Hibbs, Bobby

Reg # 26463-001

Unit  G-12

RE      Utilization Review Committee
        Case Review Decision

☐   Your request was reviewed and you have been approved /denied for the following.

☐   Your case was reviewed and approved, your procedure will be scheduled accordingly.

☐   Your case was reviewed and will need a close follow up by your primary care physician
      At this time your procedure is on hold, and re-submission of the request will be
      considered if medically indicated  Please watch call out.

☐   Your case was reviewed and it is considered an elective procedure that can wait until you
      are released from federal custody  The request for the procedure is denied  We will
      continue to monitor and provide treatment as necessary

✓   Other_____ EVALUATION  of  SEVERE  Reflux - Barum Swollow.
                        by  Specialist  has  Been  Approved.

Dr. J. Capps, MD
Clinical Director
FCI Seagoville TX

cc Medical Record



U.S. Department of Justice

Federal Bureau of Prisons

Federal Correctional Institution

Seagoville, Texas   75159

Date: 5|11|11

Inmate Name: Hibbs, Bobby

Reg. # 26443-001

Unit: B

RE:   Utilization Review Committee
      Case Review Decision

❑   Your request was reviewed and you have been approved /denied for the following:

❑   Your case was reviewed and approved, your procedure will be scheduled accordingly.

❑   Your case was reviewed and will need a close follow up by your primary care physician
    At this time your procedure is on hold, and re-submission of the request will be
    considered if medically indicated.  Please watch call out.

❑   Your case was reviewed and it is considered an elective procedure that can wait until you
    are released from federal custody. The request for the procedure is denied. We will
    continue to monitor and provide treatment as necessary.

☑  Other     Barium Swallow Requested

Dr. W. Capps, MD         Done on 6-9-2011
Clinical Director
FCI Seagoville, TX

cc: Medical Record

TEXAS HEALTH PRESBYTERIAN HOSPITAL KAUFMAN
850 W HWY 243
Kaufman, Tx 75142
Phone: 972-932-7390
Fax: 972-332-5406

817-842-9058

Final

PATIENT: HIBBS,BOBBY              ROOM #: PHK OU
DOB:      03/17/1950             MR #:  477953
AGE/SEX: 61Y M                    ACCT #: 1200591809
ADMIT MD: NONSTAFF PHYSICIAN      PT TYPE:OP
ORDER MD: CAPPS, JOSEPH MD        ORD #:KDX8388-11
COPY MD:  NONSTAFF PHYSICIAN
EXAM DATE: 06/09/2011
ADMIT. DX: DIFFICULTY SWALLOWING FOOD
EXAM: ESOPHAGUS BA SWALLOW
REASON FOR EXAM: HIATIAL HERNIA
COMMENTS:

Film and fluoroscopic studies of the esophagus compared to prior
study done 2009 shows the cervical region intact with no aspiration
and no anatomic strictures of the esophagus with a 13 mm barium
tablet passed without difficulty into the stomach. There is hiatus
hernia of a moderate sized present with a paraesophageal appearance,
and as mentioned previously I suspect this is due to prior surgery
here. This is similar. Rods are again noted in the thoracolumbar
spine. There is presbyesophagus with mucosal irregularity about the
distal esophagus which appears overall mildly worsened since the
older study. Possibilities include esophagitis and/or ulceration, and
tumor should be considered; I would recommend direct visualization
for evaluation further. There is also is a small apparent
diverticulum of the midesophagus not considered significant.)

IMPRESSION: There is a moderate-sized sliding hiatus hernia with
apparent prior surgery producing a paraesophageal type appearance
with presbyesophagus relatively severely in the lower esophagus. The
mucosal folds are very irregular here, and possibilities include
esophagitis with ulceration, or possibly tumor. Direct visualization
would be recommended.
2. Small diverticulum in midesophagus.)

Interpreted By: Michael B Collier, M.D.
Dictated on: 06/09/2011 11:13:44
Electronically Signed by: Michael B Collier, M.D.
Signed On: 06/09/2011 11:16:10

EGD
REQUESTED
DR. DUCKWORTH

PAGE 1 OF 1

.Federal Bureau of Prison
4211 Cedar Springs Rd
Dallas, Tx 75159

6/27/2011

*regional Counselor attorney;*

Dear Sir:

On 7/13/2009, I was send out for Evaluation of Severre Reflux - it
like a barum Swollow by specialist has been approved.
it went throught the Utilization Review Committee case Review
Decision. Now it is 5/11/2011 and I was send out for a requested
for a Barium Swollow. the next page is from MD Michael E Collier.
saying what is now wrong,as you can see now the apperas overall
mildly worsened since the older study in 09. the mucosal fods are
very irregular here, and possibilities include esophagitis with
ulceration, or possibly tumor. Direct visualization would be recom-
merded. now part O of the Health Services rule. say Consltants/
Specialists: the need for an inmate to be seen by a specialist or
consultant will be determined by the Health Services staff only.
The diagnosis of the consultants or specialists is only a recommenation
and the Health Services reserve the right to agree or disagree with
their recommendation. Now is the U.R.C.going to do like they did
last time, The U.R.C wated 37days befor send me out to have my eye's
look at, and it turn into a Tort Claim. now thes is the rule for.
Medically necessary - Non Emergent;
medical condition that are not immediately life-threatening but
which without care the inmate could not be maintained with out
signficant risk of;
1. serious deterioration leading to preemature death:
2. significant reduction in the possibility of repair later without
   present treatment:
3. Singnificant pain or discomfort which impairs the inmate partic-
   ipation in activities of daily living. *it hard for inmate to eat some food. and drink water at some times.*

now thes what the dictionary say for this word; visualization.
1. necessary for life. 2. having great importance. 3. Essential.
now how long is the U.R.C. going to wate to fix this problem?
cc: Dirrctor B.O.P.
cc.U.S.District Court
cc: office Pardon Attorney
cc: President Obama
cc: Mr Jason Sickier- regional Couneclor Attorney

513-110

| MEDICAL RECORD | CONSULTATION SHEET |
|---|---|

## REQUEST

| To: | FROM: (REQUESTING PHYSICIAN OR ACTITITY) | DATE: |
|---|---|---|

## EYEGLASS PRESCRIPTION

| DISTANCE | | | | | DEC | |
|---|---|---|---|---|---|---|
| SPHERE | CYLINDER | AXIS | PRISM | DIRECTION | IN | OUT |
| **RIGHT** | | | | | | |
| −0.75 | sph | | | | | |
| **LEFT** | | | | | | |
| −0.75 | sph | | | | | |

**ADD**

**RIGHT**
+2.00

**LEFT**
+2.00

### SEGMENT INTRUCTIONS

| HEIGHT | WIDTH | INSET | |
|---|---|---|---|
| R 18 | | R | R |
| L 18 | | L | L |

| PUPILLARY WIDTH | |
|---|---|
| DIST | NEAR |
| 63 | 60 |

Note Order Two Pair
① With G-15 Grade IV Tint
② Clear

| SEG. STYLE | ORTH. F TILLER D | EXECUTIVE TYPE | KRYPTOK | PANOPTIK | CURVED TOP | TRIFOCAL AND TYPE | STRAIGHT TOP | OTHER. |
|---|---|---|---|---|---|---|---|---|
| | 22 | | 22 | 21-24 | 22-25 | | 22  25  45 | |

| FRAME OR SHAPE | #G-15 + Grade IV | #2 Clear | EYE SIZE | BRIDGE SIZE | TEMPLE LENGTH AND STYLE |
|---|---|---|---|---|---|
| 59 Arbor | | | 50 | 26 | 155 |

Signature: Dr B Arthur Bigon       Date: 4/4/11

INMATE NAME: Hibbs, Bobby  - $33.30
REG. #: 260463-001

$22
$15
$37

**HEALTH SERVICES UNIT,   FCI SEAGOVILLE TX**

### Comments

61 yo WM
Hx of Glaucoma
Meds Travatan qhs
      Timoptic qd
Hx of Left Blindness 2nd of Prematurity

Recent Pressure @ Retinal Office 20 min Rt Eye
MR −0.75 sph 20/25 + 1
A/15/35 @ 12:00pm Accurate
Ant Seg: Bilateral IOL's
Rt Eye 3+ SM Pigmentation IOL
Lt Eye 2+ K. Precipitates
Post Seg CO .3/2 Rt
Av/mac
Imp: Glaucoma
     IOP stable
Plan: Rx 2 spears
          RTC

MAIL TO: Federal Prison Industries
Box 100
Butner, N.C.  27509

Every 2 months
fn IOP ✓
Cont Meds

RECEIVED
APR 04 REC'D
J. CAPPS, MD
CLINICAL DIRECTOR

25

| MEDICAL RECORD | CONSULTATION SHEET |
|---|---|

| | REQUEST | |
|---|---|---|
| To: | FROM: (REQUESTING PHYSICIAN OR ACTIVITY) | DATE: |

## EYEGLASS PRESCRIPTION

| DISTANCE | | | | | | DEC | |
|---|---|---|---|---|---|---|---|
| SPHERE | CYLINDER | AXIS | PRISM | DIRECTION | | IN | OUT |
| RIGHT | | | | | | | |
| | | | | | | | |
| LEFT | | | | | | | |
| | | | | | | | |

**ADD**

**RIGHT**

**LEFT**

| SEGMENT INTRUCTIONS | | | |
|---|---|---|---|
| HEIGHT R | WIDTH | INSET R | R |
| L | | L | L |

| PUPILLARY WIDTH | |
|---|---|
| DIST | NEAR |

SEG. STYLE: ORTH. F TILLER D | EXECUTIVE TYPE | KRYPTOK | PANOPTIK | CURVED TOP | TRIFOCAL AND TYPE | STRAIGHT TOP | OTHER.

22 | | 22 | 22-24 | 22-25 | 22 25 35 | 22 28 45 / 25 28 35

| FRAME OR SHAPE | | EYE SIZE | BRIDGE SIZE | TEMPLE LENGTH AND STYLE |
|---|---|---|---|---|
| | | | | |

**Comments** Hx of Disc Hem Rt Eye 2/8/2010

60 yo WM Hx of RLF OS
Last Visit → 2-8-2010
Saw Dr Potezner 5-12-2010

s Rx 20/30 /NLP

c Rx 00/-0.75 20/25 +1
OS

A
14/37 @ 1150 pm

Ant Seg - C/Q OU
Bilateral IOL OU

Post Seg C/D Rt ·1/1



myelenated
Nerve Fiber
Lt Optic Atrophy

AV/Med - Rt - WNL
Lt chorio/Retinal
Atrophy

Imp: Disc Hem Resolved
IOP stable @ 14 OD
Plan: Continue Meds

Signature: Dr B A J Bobby

Date: 7-8-2010

**MAIL TO:** Federal Prison Indstustries
Box 100
Butner, N.C. 27509

REVIEWED

Travatan ghs
Cosopt BID
RTC 8wks IOP ✓

INMATE NAME: Hibbs, Bobby
REG. #: 26463-001

JUL 12 2010

J. CAPPS, MD
LESTX GOVI...TX

**HEALTH SERVICES UNIT, FCI SEAGOVILLE**

Followed
By Eye

**MEDICAL RECORD** | **CONSULTATION SHEET**

| REQUEST | | |
|---|---|---|
| To: | FROM: (REQUESTING PHYSICIAN OR ACTIVITY) | DATE: |

## EYEGLASS PRESCRIPTION

| | | | | | | DEC | |
|---|---|---|---|---|---|---|---|
| DISTANCE | | | | | | | |
| | SPHERE | CYLINDER | AXIS | PRISM | DIRECTION | IN | OUT |
| RIGHT | | | | | | | |
| LEFT | | | | | | | |

| ADD | |
|---|---|
| RIGHT | |
| LEFT | |

### SEGMENT INTRUCTIONS

| HEIGHT | WIDTH | INSET | |
|---|---|---|---|
| R | | R | R |
| L | | L | L |

| PUPILLARY WIDTH | |
|---|---|
| DIST | NEAR |

SEG. STYLE: ORTH. F TILLER D (22) | EXECUTIVE TYPE | KRYPTOK (22) | FLATOPTIC (25-14) | CURVED TOP (22-25) | TAIFOCAL AND TYPE | STRAIGHT TOP (22 25 28 35 45) | OTHER.

| FRAME OR SHAPE | | | EYE SIZE | BRIDGE SIZE | TEMPLE LENGTH AND STYLE |
|---|---|---|---|---|---|

**Comments**

59 yo WM (LEE 4·20-09)

Saw Dr Pateseznik 11/10/2009 ○

D'd'd w. th Glaucoma 04
Diffuse Choriorethal Atrophy OS +
$\frac{A}{16/38}$ MR -0.75 20/35 +

Ant Seg - WNL OY
Post Seg - Rt Eye CD ·1/100/ Atrophy OS
✱ Note Rt Eye Disc Hemorrhage
Rt eye

Disc Hemorrhage →  Rt eye

Impressions: Disc Hemorrhage
Rt eye
IOP needs to be
Target 12 Rt/
R✗ Mod  Tonometre 21C/
bucks

Signature: Dr B A.H (Say)            Date: 2-8-10

**REVIEWED**

**MAIL TO:** Federal Prison Indstustries
Box 100
Butner, N.C. 27509

FEB 1 0 2010
J. CAPPS, MD
FCI SEAGOVILLE, TX

INMATE NAME: Hibbs, Bobby
REG. #: 26443-001

✓ Cosopt

**HEALTH SERVICES UNIT, FCI SEAGOVILLE TX**

N/Cosopt
+ Ig H Cu BIO
# 10ml indefinitly

AS of 7/8/2010 ✓

MR -0.75   20/30 +1

**CONSULTATION SHEET**

| To: # 7674 | FROM: (REQUESTING PHYSICIAN OR ACTIVITY) -- 10389735 | DATE: |
|---|---|---|

REQUEST

## EYEGLASS PRESCRIPTION

DISTANCE

| | SPHERE | CYLINDER | AXIS | PRISM | DIRECTION | DEC | |
|---|---|---|---|---|---|---|---|
| | | | | | | IN | OUT |
| RIGHT | -1.00 | -0.25 | 145 | | | | |
| LEFT | -1.00 | sph | | | | | |

ADD

RIGHT

LEFT

| SEGMENT INTRUCTIONS | | | |
|---|---|---|---|
| HEIGHT R | WIDTH | INSET R | R |
| L | | L | L |

| PUPILLARY WIDTH | |
|---|---|
| DIST 58 | NEAR |

SV PLAS 22.
17
30.60 (34)

**Comments**

59 yo WM
Blind in Lt eye since birth
at Med [...] Since 2000

A
17/35 @ 10:45
MR -1.00 -0.25 x 145  20/20
OS                     NLF
Cornea [..] [Iris] severe — unlod
CD .1/.00          OS Total
AV unlod           Atrophy b
Mac — unlod        scarring from
                   RLF & Glauc

RTC-1yr

| SEG. STYLE | ORTH.F TILLER D | EXECUTIVE TYPE | KRYPTOK | PANOPTIK | CURVED TOP | TRIFOCAL AND TYPE | STRAIGHT TOP | OTHER |
|---|---|---|---|---|---|---|---|---|
| | 22 | | 22 | 25-24 | 22-25 | | 22  28  45 / 25  35 | |

| FRAME OR SHAPE | | EYE SIZE | BRIDGE SIZE | TEMPLE LENGTH AND STYLE |
|---|---|---|---|---|
| 59 Amber | | 48 | 22 | 155 |

Signature: _DaB [...] Bogg_      Date: 4-20-09

MAIL TO: Federal Prison Indstustries
Box 100
Butner, N.C. 27509

INMATE NAME: _Hibbs, Bobby_
REG. #: _26463-001_

(11)

**HEALTH SERVICES UNIT, FCI SEAGOVILLE TX**

§ 10.3 Right to Medical Aid

The power of the federal courts to adjudicate an inmate's compaint medical treatment requires that federal right be involved in the medical treatment.

41. A federal inmate coplaining about medical treatment in the institution utilizes the federal habeas procedure. see Chapter 11, infra for a discussion of prisoner's remedies.

The inmate must allege the presence of a federally protected right. Several federally protected right have been enunciated by the federal courts in medical treatment cases:

1. Right to due process of law under the Fifth or Fourteenth Amendments. The due process right has been couched in terms of the inmate right to be free from an abuse of disretion on the part of prison administrators; protection from unconstitutional administrative action, protection of an inmate life and health from administrative action...

2. Right to be free from the infliction of cruel and unusual punishments guaranteed by the Eighth Amendment. The Eighth Amendment right has been found when there is an intentional deliberate indifference to medical needs of inmates...

6/4/2011

dear Sir:

I'am bobby Hibbs inmate at F.C.I. Seagoville. I don't know if you can help me with anything? But you ask for inmate to let you know what going on here. thes are just some of the concern and question I have.

1. tort claim no 𝑇𝑅𝑇-𝑆𝐶𝑅-2011-00253 that no one will talk with me about. the BOP just tell me that they have untill July 2. to answer me. even when a court told them they had only until 1/20/11 to ack on it.

2. get good medical care.

3. Since a tort claim is a malpractice claim it should be look into. I have gone all the way to President Obama to ask for a Board of Inguity on medical care here. and I have sent letter to the medical staff here, the BOP in dallas, the DOJ in Washing DC and the BOP Washing DC, with no answer.

4. I saw one inmate die in our unite because ther is NO medical care after they do last pill line, and that was just this march.

5. I have a case in court now. about this. case No 3-11-CV-0692-N-BD. and I have even not look into 18 U.S.C. 1001 for them knowinly alters, cover up, or make make false entry in any record. I can show they have done that.

6. I have sent request and copout for thing, and not get any answer.

7. Medical dosen't answer copout. I send one and ask about it. medical record told me they had 90 day to answer them. No they only have 15 days. you can't gave them copout in the office, you have to send it my in house mail. and most the time they don't get them.

8. All my mail going home is open. and I'am been told that I'am not on ther so call hot list. they have even open my leaugl mail going out.

9. even ther Warden said it not mamdate the BOP do anything for us.

this what the court paper said. the Plaintiff, who is blind in his left eye and has dimimished vision in his right eye due to a corneal thinging abonormality, a damagee retina, and glaucoma, contends that he received inafequate mediacl care at various times during his incareratuion at F.C.I. Seagoville. his complaint which is accompanied by 250 pages of attachments of paper work. alleges that the Warden

and doctor and other employees was indifferent to his medical need
by failing to promptly treat his eye condition and by not timely
refrring him to a specialist. although his claims and legal theories
are difficult to decipher. why can't I get any answer to anything
I ask?

So now is the question? what can you do, to help?

Sincerely:

Bobby Hibbs 26463001
F.C.I.
P.O.Box 9000
Seagoville, Tx 75159

ps can i call you at that number?

To establish outrage, a plaintiff must show that (1) the defendants either intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from their conduct; (2) the conduct in question was extreme and outrageous; and (3) the conduct caused emotional distress so severe that no reasonable person could be expected to endure it. By extreme the court refers to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.

Would you call "outrage" by Medical staff. When. the C D. tell you that a Medical "Emergency" Would be at their "Discretion" But in their Hand Book. a "Medical Emergency" is anything threatens the inmate immediate "Health or welfare."

or When you come back from the Opthalmologist after you are told of all the damage, to your good eye. And the C D, Dr Capps, see you in his office. And tell you. this.

"Just because you are Blind in one eye and cant see out the other. doesn't make me special.

Even now. Doctor Capps will not answer copout about my eye.

[Complete Medical]
Encyclopedia

1. Bruning eye; When the eye is burned or burning the person tends to keep the eye closed because of the pain. This may trap the initating substance against the surface of the eye. Increasing the Damage. The eye should be flushed with water Immediately. Applying a cool compress can help relive pain and swilling. Burning is an "EMERGINCY" requiring the Fastest possible treatment...

2. Treatment of Conjunctivities depends on the Cause. Ther are two kinds.

1. Viral Conjunctivities: clears up on it own. antibiolice are of "NO" use.
2. Bacterial Conjunctivities; is treated with antibiolic drops.
3. the staff here put down Unspecified Conjunctival.
this show they didn't know which kind they were treating.

[Acute (angle-Closure) Glaucoma]

1. An attack of acute glaucoma occues most commonly durning conditions in which the pupil is dilated, as such an in a darkined movies theater or as a result of Stress.

1. The eye turns red looks swollen or cloudy, and become so painful that nause may result, Vison Blues, and halos may apper around light. An Acute Glacoma attack is an "EMERGENCY" that Requires Immediate Attention "...

[Glaucoma] Can be detected in a Standard eye examination. There are four parts of screening.

1. A Ophlhalomscope-is used to look inside the eye.
2. A Tonometry- Measures the pressure inside the eye.
3. A visual field Test-Will see the full renge of peripheial Vision.

It shown from all my Medical record, that none of this was done.

And you see were they put [Unspecified Glaucoma] again it shown they didn't know what they were treating.

[ Exhibit ] ⊕M

[ REASONABLE MAN [ OR PERSON ]

A phrase used to denote a hypothetical person who exercises
qualities of attention, knowledge, intelligence and judgment that
society reqires of its members for the protection of their own
interest of other. Thus, the test of negligence is based on either
a failure to do something that a reasonable person, guided by
considerations that ordinarily regulate conduct, would do, or on
the doing of something that a reasonable and prudent person would
not do.

Case in hand.

The plaintiff has work around Hosp as a jantor in ICU and ER, for about 10yr
he knew ther was something wrong with his right eye, because he is blind in the
left one since birth. He went to the only place that he could go. and that was
the health care unite at F.C.I. Seagoville. It was not like he could go out to
the hosp ER. or to his own eye doctor.

Now the B.O.P. has ther own eye doctor that come in two time a month. but in
those 47 days. that the medical staff was see the plainitff. not one time did
he get to see the eye doctor. Until his eye sight got worse, only then did they
try and get him to see a outside doctor, but again they had ther own eye doctor
that could have see the plaintiff. in that time. And the plaintiff can show
that his concern was sent to the U.R.C. That is the Utilzation Review Committee,
And the plainitff can show were his eye concern should have naver been sent
ther. becuse ther is a medical rule that say,

[medically necessary]  Acute or Emergent:

Medical conditions that are an Immediate, Acute or Emergent Nature. which
without care would cause rapid deterioration of the inmate health. Signigicant
Irreversible loss of Function, or be life threatening.

Examples of conditions considered acute or emergent include, but are not limited
to.

1. Myocardial infarction;
2. Severe trauma, such as head injuries;
3. Hemorrhage; the plaintiff had herorrhage to the right eye. *sept to Nov 2009*
   *again cough up blood. July 2,2011 nothing was done.*
4. Stroke;
5. Status asthmaticus;
6. Precipitous labor or complicationa associated with pregnancy;

7. Datached retina, sudden loss of vision; the plintiff has retina damage and lost of vision with in this time fram.

[ Treatment for conditions in this category are essential to sustain life or function and Warrant Immediate Attention...]

[Medically necessary] Non Emergent;

Medical conditions that are not immediately life-threatening but which without care the inmate could not be maintained with out significant risk of;
1. Serious deterioration leading to preemature death;
2. Significant reduction in the possibility of repair later without present treatment;
3. Singnificant pain or discomfort which impairs the inmate participation in activities of daily living;

the plaintff did his part in trying to get medical care;



## COMPLAINT REFERRAL

May 10, 2010

Chief, Coordination & Review Section
Civil Rights Division
US Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

This office has received the enclosed complaint(s) from:

Bobby Hibbs
# 26463-001
Federal Correctional Institution
PO Box 9000
Seagoville, TX 75159-9000

We have informed the complainant that we have referred the matter to your
agency. Please correspond directly with the complainant, and notify us in writing
as to all actions taken concerning this matter.

Sincerely,

Martin Dannenfelser
Staff Director

Enclosures

M1-73-0
May 21, 2010



**U.S. Department of Justice**

Civil Rights Division



*Coordination and Review Section - NWB*
*950 Pennsylvania Avenue, NW*
*Washington, DC 20530*

JUL 2 3 2010

Doc #331727

Mr. Harley G. Lappin
Director
Office of General Counsel
Federal Bureau of Prisons
320 1st Street, NW
Room 654
Washington, DC 20534

# RECEIVED

JUL 2 8 2010

Administrative Remedy Section
Federal Bureau of Prisons

Dear Mr. Lappin:

Enclosed for your review is a letter received by the Coordination and Review Section of the Civil Rights Division of the U.S. Department of Justice. The matter does not appear to be within the jurisdiction of our office.

However, the issues raised may fall within the jurisdiction of your agency and, therefore, we are referring it to you for appropriate disposition. The writer has been notified of the referral.

Thank you for your assistance in this matter.

Sincerely,

Mark Kappelhoff
Acting Chief
Coordination and Review Section
Civil Rights Division

Enclosure

CC: U.S. Commission on Civil Rights

Southwest Eye Clinice
Joe Potasznik, M.D.                                    8/11/2011
4255 Highway 67 E (I-30)
Mesqvite, Tx 75158


DR Potasznik:

Dear Sir:

Thes is to gave you copy of the note from the Retina Institute
of Texas, Pa. So you will have copy of them for my record.
Mr Potasznik, F.C.I. Seagoville can"t fine some of my medical
report. from a copy that I have it has the date of 2/3/2011
it has 4 month follow up per Dr. Potasznik. that would put in
about june sometime. would that be about right?  I ask today and
was told that they have not set up anymore follow up with you.
I would like to know if you are going to need any more follow
up appt? As you can see from the EyeGlass Prescription on 4/4/11
they did get me some Glass to read with and ther eye doctor
want to look at the ( IOP ) every two month. But they are not
even doing that. And I don't know if they are from the way they
are talking here. I just would like for you to let me know if
ther going to be any more follow up with your office, Thank you
for looking into this matter for me.


                                              Sincerely:

Bobby Hibbs 26463-001
F.C.I.
P.O.Box 9000
Seagoville, TX 75159



**U.S. Department of Justice**

Federal Bureau of Prisons

*South Central Regional Office*

---

*4211 Cedar Springs Road, Suite 300*
*Dallas, Texas 75219*

March 11, 2011

Bobby Joe Hibbs
Reg. No. 26463-001
Federal Correctional Institution
P. O. Box 9000
Seagoville, TX   75159

Re: Administrative Tort Claim - TRT-SCR-2011-00253

Mr. Hibbs:

This is in response to your recent inquiry regarding the July 2, 2011, six month due date in reference to your tort claim noted above.

A review of our records indicate that your tort claim was initially received in our office for processing on July 23, 2010; however, it was rejected because you failed to sign the form and you did not provide a specific sum certain.   Further review of our records indicate that you resubmitted your claim on December 30, 2010, and it was received in our office for processing on January 3, 2011.   The Federal Tort Claims Act affords the government six (6) months from the date the claim was accepted **(January 3, 2011)**, to make an administrative decision.   Therefore, a response will be mailed to you via certified mail on or before July 2, 2011.

Sincerely,

K. Summers
Paralegal Specialist

/jw

Istard cough up blood around 12:00am, I went and show the C.O. he call
the LT. Ther was no medical staff, on the ground. I was told the power
was off and no phone. That I would have to wate until 6:00am to see
medical staff, again at 1:00am show the C.O. that I was Hemorhage up more
blood, again the LT. was call. he know but you have to wate to see medical.
at no time did anyone come to my cell and check on me. not even the C.O.
it going on 7:00am and I'am told that ther is a medical Emergent in unite
54, and they will get to me as soon as they can, the medical emergent in
54 die, when the C.O did get hold of medical they told me to come and see
them about noon. that would make it over 12 hours befor any one saw me.
it didn't help that it was the 4 of july weekend. and they are short of
staff. by the time I saw medical. it was 12:30am even with the C.O. tell
him I was coughing up blood, and the blood I show him that was on a roll
of tisue paper, he said he didn't see me do it, but he didn't do anything
but put me in a wheelchair because I was get light head, until tusday and
for me to come back to sick call.
On sunday the 3 of july my case mag chopan came and ask if he could used
the wheelchair ther was a inmate down, I said yes, then he told me to get
up and push it over to were the inmate was, I told him no because I get
lighthead, that why I have the wheel chair for. he got mad and told me I
could not get out of my cell even to go to the bathroom. On monday the 4
the C.O. came and got my wheelchair. and when I ask him how was I going
to get to lunch. he told me to walk. I did not make it I got light head,
and went down. the C.O. came out to see about me, and Call medical that
they need a wheelchair, RN Gifford told them ther was not any up ther. she
lie, because ther was 4 of them, they send me out to the hosp, they used
one to get me to the back stare so I could walk down them.
On tuseday 5/2011
was told to come back and pick up my new med that was gaven from the hosp.
Iwas told they didn't have them because MD Capps could not fine the
paperwork from the hosp. so on wenday I went back to pick them up, they
only had one of them were I should had two. one was for the lighthead and
the other blood pressure.

B/P as of july 1, 2011 was 149/93 pluse was up.

1, Mkeilizine HCT. 25 mg take one Tablet by mouth four times a day
as Needed for 10 days. Refills 0 #d 20. J'am d wrong,
4 X 10 = 40. from 4 a day they cut it down to 2 a day. it
and this was wrote by the hosp. I why cut some one med. his it

Mr Marcus L Allen, MD
Retina Institute of texas
3414 Oak Grove Ave                                    8/22/11
Dallas, Tx 75204


Mr Allen:

You saw me In arpil 2011 about eye damage. In you report you put
that you didn't need any more follow up. I know you are not my
primary provider for eye care. but you put in your report, if I
should have any conern I should let the medical staff here know.
And they have a eye doctor here, who put down he would like to
check my eye every two month, and doctor Potasnik was do it doing
every 6 to 8 wk. it now been 4 month with no onw look at them.
could you tell me how often should I have my eye's look at. and
check the (IOP). I ask them when was I going back out to have my
eye look at. They told me I'am not. that they have stop my out-
side appt. in the next page you will see what they go by, here.
they are under no obligation to follow consultant recommendations.
. I know you put down in your report what I should look for. oh
I ask for a copy for your report in april, I just got it. what
what do you think I should do about this matter. think you for
your time.

                                              Sincerly:

Bobby Hibbs 26463-001                         Mr Hibbs
F.C.I.
P.O.Box 9000
Seagoville, Tx 75159

March 3, 2011

Exp of medical care,

In bld B-53 there is a Emergency Defibrillator: But ther is not anything in it. each
unite has one, But the only blding that has one is bld 9. All the other are just Box
on the walls. On March the 3 one of the inmate stare to "Hemorrhage" at about 2:30am
ther was no medical staff here at the time. So the inmate went to the CO. office
and let him know, that he did not feel good, by the time they got hold to the LT,
and made call to the medical staff that was on call. Some time had pass, and by that
time the inmate was hemorrhage , up blood and seting in a chair. by the time they
call the outside E.M.T. they got ther and he was on the floor. by the time they got
him out side to work on him he was gone. they work on him outside the unite about
15min. with C.P.R. and the defibillator. the next day in the unite they had what you
would call a town hall. to tell us how sorry they were that he past away. they ask
if ther was anything that us inmate would like to talk about or ask. thes are just
a few of the thing.                                      .

1. why were ther not any medical staff here after last pill call.
2. How come the emergency defibrillator box, why was ther not one in it.
Why did you not call a hosp first.
4. why did you call the medical staff.
5. why did you not call the E.M.T. so they could have been on ther way.

Curtis Burtis; was the inmate who die.
3-25-2011 they Put Emergency Defibrillator in the Box in the Unites.
But dont Know if staff Know how to used them?

I have wrote MD Potasnik to see if he need any maore follow up?
And since your own eye doctor put down on 4/4/2011 he would
like to see me every two month and you have not even done that.
and it now going on 5 month, since anyone has look at them. Now
if I come over to medical are you and your staff going to do
something about my eye's. You can't tell me you are going to
send me out, you told me you have stop those appt.I know you
staff can't do eye exam. it took them 47 days last time to see
something wrong. Now with my Hiatial Hernia that has milidly
Worsened since 2009 And the medical report say Direct
Visualizationwould be recmmerded, Now I get a paper Re:
Utilization Revew Committee case Review Decision, saying
(surgeon) follow up. How long will this take? are you going to
fix it or not. or are you going to put me back on the U.R.C.
waiting list with recommended parameters as to the length of
time the procedure may be delayed with out increasing the risk
of additional morbidity. like you did last time. if that all
you are going to do I like to be move to a medical F.C.I.
copy of this have been made, if you fail to answer. Since the
CD is under no obligation to follow consultant recommendations.
If The recommendations is not going to be followed, I like to
have this document and Justification in my health record.

**Bureau of Prisons**
**Health Services**
**Consultation Request**

Report of Consultation

Inmate Name: HIBBS, BOBBY JOE
Date of Birth: 03/17/1950 00:00
Institution:  SEAGOVILLE FCI
2113 NORTH HWY 175
SEAGOVILLE Texas 75169
9722872911

Reg #:   28488-001
Sex:     M



Complaint by:                              Joel Potasznik, M.D.

                                              9/01/2010

Report may be hand-written or (preferably) typed on this form. If dictated on office or hospital letterhead to
follow, please indicate essential findings or recommendations to be acted upon pending final report.

Follow-up services and primary responsibility for inmate health care remains with Bureau of Prisons staff.
While discussion of diagnostic/treatment options with the inmate may be appropriate, they are subject to review
by the inmate's primary care provider, the institution utilization review committee and/or the BOP National
Formulary.

Please notify institution prior to scheduling surgery date or follow-up appointments.

Inmate not to be informed of appointment dates.

Generated 05/13/2010 12:50 by Ceppa, J. MD, CD              Bureau of Prisons - SEA

                                                                     Page 2 of 2

### 10.3 Right to Medical Aid

Prisoners in state and federal institutions have sought redress in the federal court system **for medical** treatment they have received and failed **to** receive. Complaints about **medical** treatment have included claims about the adequacy and nature **of** the **medical care** received, allegations **of** a total denial **of medical care**, improper **medical care**, inadequate **care**, and conduct **of** prison ofcials attendant **to** the **medical care**.

The power of the federal courts to adjudicate a prisoner's complaint about medical treatment requires that a federal right be involved in the medi-cal treatment.[43] The prisoner must allege the presence of a federally protected right. Several federally protected rights have been named by the federal courts in medical treatment cases:

> **1**    Right to due process of law under the Fifth or Fourteenth Amendments.[44] The due process right has been couched in terms of the prisoner's right to be free from an abuse of discretion on the part of prison administrators;[45] protection from unconstitutional administrative action;[46] protection of a prisoner's life and health from administrative action.[47]

> **2**    Right **to** be free from the iniction **of** cruel and unusual punishments as guaranteed by the Eighth Amendment.[48] Violation **of** Eighth Amendment rights has been found when there is an intentional denial **of** needed **medical care**, or when a prison **of**'s conduct indicates deliberate indifference **to** the **medical** needs **of** prisoners.

Despite the willingness **of** federal courts **to** hear cases that involve the federally protected rights **of** prisoners **to medical** aid, there are limits **to** what prisoners can expect **to** accomplish through the courts. In *Priest v. Cupp*,[49] the court explained that neither federal nor state constitutional prohibitions **of** cruel and unusual punishment guarantee any prisoner that he or she will be free from or cured **of** all real or imagined **medical** disabilities while he or she is in custody. What is required is that the prisoner be afforded such **medical care**, in the form **of** diagnosis and treatment, as is reasonably available under the circumstances **of** his or her conand **medical** condition.

Just as prison ofcials cannot deny all **medical** aid, prisoners cannot expect a **medical** services system. Consequently, litigation involving the **medical** rights **of** prisoners has now focused upon the nature **of**

Constitutional Rights of Prisoners                    1

© 2010 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Create PDF files without this message by purchasing novaPDF printer (http://www.novapdf.com)

**UTILIZATION REVIEW.** Every institution will have an established Utilization Review Committee (URC), chaired by the Clinical Director. Other members should include, but not be limited to the:

- HSA or Assistant HSA;
- Medical Trip Coordinator;
- Health care provider(s) directly involved in the reviewed cases;
- Director of Nursing (if applicable); and
- A chaplain or social worker.

The URC will review the following areas:

- Outside medical, surgical, and dental procedures;
- Requests for specialist evaluations, in-house or escorted trips to the specialist's office (approved by the Clinical Director);

*Neglect by* → Requests for "Limited Medical Value" treatments/procedures
*MD Copp.* (approved by the CD);
*Werle Buy.* • Retrospective review of all cases sent to the community
*Mr Me Gaugh.* hospital during hours when no health care provider was on duty at the institution;

- Case considerations for extraordinary care;
- Concurrent review of inpatients at community hospital (monitoring length of stay and interventions); and
- Other services the primary care provider or the Clinical Director have recommended.

(Note:) (Care considered "Medically Necessary – Acute or Emergent" does not require URC review prior to the treatment being provided. *Medics - by medica staff.*

a. **Recommendations.** The URC must select one or more of the following, to address each case presented to it:

- Approve the request without modification;
- Refer the inmate for further evaluation to a staff physician;
- **Refer the inmate for further evaluation to a specialty consultant;**

*this is* → **Put the inmate on a waiting list, with recommended**
*Neglect.* **parameters as to the length of time the procedure may be delayed without increasing the risk of additional morbidity;**

- **Determine that the procedure is contraindicated, due to unacceptable risk to the inmate if it is performed; or**
- **Deny the request for the procedure.**

© 2010 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Office of General Counsel
Federal Bureau of Prisons

Dear Sir:

I have send you a Freedom of Information Act. And would like all
that has to do with my matter send to me.information why you
didn't have jurisdiction of this matter?
Were it say, OIG may decide to investigate to ~~investigate~~ a
potential criminal violation or serious Administrative infraction,
rather than deferring the matter to the B.O.P
None of the procedures or guidelines in the medical program
Statment are meant to limit or override the exercise of sound
medical judgment by the physician responsible for medical
care...
10.3 Right to medical care:
Right to due process of law under the Fifth or Fourtewnth Amen dment
the due process right has been couched in terms of the prisoner's
right to be free from an abuse of disretion on part of prison
Adminstrators,
(A) MEDICALLY NECESSARY- ACUTE OR EMERGENT:
Medical conditions that are of an immediate, acute or emergent
nature, which without care would cause rapid deterioration of
the inmate's health, significant irreversible loss of function,
or may be life-threatening.

Examples of conditions considered acute or emergent include, but
are not limited to:

(1). myocardial infarction;

(2). severe trauma such as head injuries;

(3). hemorrhage;

(4). stroke;

(5). Detached retina, sudden loss of vision.

Treatment for conditions in this category are essential to
sustain life or function and warrant " IMMEDIATE" attention... *Not*
*47 day latte*

I can show this was ignore by your medical staff;

for thes is the damage to my right eye,

(1). Thinning of the Corneal- right eye;
(2). Damage retina- right eye;
(3). Disc hemorrhage-right eye;
(4). Glaucoma- right eye;
(5). Diminished vision - right eye.

I have been blind in my left eye since birth, and your medical
staff knew of this, and this the turm for Neglect...

[ to disregard, ignore, to fail to give proper attention too ]

Now can you tell me why ther was no investigative done, to see
why this kind of [ NEGLECT ] can happen...

**1. Submit To Appropriate Federal Agency:**
Federal Bureau of Prisons
Tort Claim Admin # 300
4211 Cedar Springs Road
Dallas, Texas 75219

**2. Name, Address of claimant and claimant's personal representative, if any. (See instructions on reverse.) (Number, Street, City, State and Zip Code)**
Bobby J Hibbs#26463-001
F.C.I.
P.O.Box 9000
Seagoville Tx 75159-9000

| 3. TYPE OF EMPLOYMENT ☐ MILITARY ☒ CIVILIAN | 4. DATE OF BIRTH Mar 17,1950 | 5. MARITAL STATUS Married | 6. DATE AND DAY OF ACCIDENT Sept 25,2009 Friday | 7. TIME (A.M. OR P.M.) 8;30 Am |

**8. Basis of Claim** (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary.)

Inproper Medical Care resulting in Damage & injury. Please see proof
Of claim in inclosed documentation.

phace - F.C.I.
P.O. Box 9000
Seagoville, Tx

**9. PROPERTY DAMAGE**

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).
N/A

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF DAMAGE AND THE LOCATION WHERE PROPERTY MAY BE INSPECTED. (See instructions on reverse side.)
N/A

**10. PERSONAL INJURY/WRONGFUL DEATH**

STATE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE NAME OF INJURED PERSON OR DECEDENT.

1. Corneal Thinning. Right eye.
2. Disc Abnormality Right eye
3. Disc Hemborhag. Right eye.
4. Retina Damage Right eye
5. Glaucoma Right eye
6. Diminished Vision Right eye

**11. WITNESSES**

| NAME | ADDRESS (Number, Street, City, State and Zip Code) |
| | |

Received
JUL 23 2010
Bureau of Prisons
Legal Department, SCRO

| 12. (See instructions on reverse.) AMOUNT OF CLAIM (In dollars) | | | |
| 12a. PROPERTY DAMAGE. -0- | 12b. PERSONAL INJURY $ 12,500,000 | 12c. WRONGFUL DEATH - 0 - | 12d. TOTAL (Failure to specify may cause $ 12,500,000 + Medical |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side.) Bobby Hibbs | 13b. Phone number of person signing form | 14. DATE OF SIGNATURE July 20, 2010 |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
| The claimant is liable to the United States Government for the civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729.) | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

55-109
NSN 7540-00-634-4046
STANDARD FORM 95
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

TRT-SCR-2011-00253

## INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of his vehicle or property.

15. Do you carry accident insurance? ☐ Yes    If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number.    ☒ No

16. Have you filed a claim on your insurance carrier in this instance, and if so, is it full coverage or deductible?    ☐ Yes    ☒ No    | 17. If deductible, state amount.

18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts.)

19. Do you carry public liability and property damage insurance? ☐ Yes    If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code).    ☒ No

## INSTRUCTIONS

Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident. If the incident involves more than one claimant, each claimant should submit a separate claim form.

**Complete all items - Insert the word NONE where applicable.**

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY

Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations. If more than one agency is involved, please state each agency.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item #12 of this form.

DAMAGES IN A SUM CERTAIN FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN TWO YEARS AFTER THE CLAIM ACCRUES.

The amount claimed should be substantiated by competent evidence as follows:

(a) In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

(b) In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

(c) In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

(d) Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
A. *Authority:* The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. *Principal Purpose:* The information requested is to be used in evaluating claims.
C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid".

## PAPERWORK REDUCTION ACT NOTICE

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501. Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention: Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, D.C. 20530 or to the Office of Management and Budget. Do not mail completed form(s) to these addresses.

SF 95    BACK

[First Exception]
the defendant knew that the plaintiff was blind in his left eye, And
the defendant Doctor Capp, made appointment to see plaintiff on Sep
25, 2009, and this was at 9:20am when he was told about eye cornce
of the plinitff, when the inmate was to see Doctor Capps at 12:30pm
he had candel all his appointment, and did not tell the inmate, by
the time the inmate found some one to talk with about his eyes, medical
was closeing, and the plaintiff couldn't get any kind of medicain for
his eyes until sept 28, 2009.
With Doctor Capps doing this was Negligence on his part. because
ther was a great danger, when the plaintiff was allread blind in his
left eye. so the actor Dr Capps is required to exercise more caution.

1. this show. Misconduct by Doctor Capps. in policy regulation, and Practice.
   that turn into Neglect, Malpractice, Malicous.

[second Exception] Warden, M Cruz; walk the inmate over to
McGaugh, the Health care Administor, she did do something, But when
the Warden , was told again about bad health care, and she didn't
do anything about it. And told the inmate that the B.O.P. was not
mandate to do anything for the inmate. she show " Misconduct" to
the Policy, Reguation, and Practice. of Program Statement No 1210.21.
And when she did not see that the inmate got the medical care he
need, she did not go by program Statement No 3420.09. Employee's
conduct and Responesbility. Issued by the office of Goverment Ethices.
and the Department of Justice.

[Third Exception] Mr. McGaugh, Administor of Health care. when Warded Warden
Curz, walk inmate Hibbs, over to him on Oct 7, 2009. to take care
of medical concern, Mr McGaugh took the inmate Name and Number.
and said he would get back with him. His "Misconduct" of not doing
anything. was a Breach of Policy, Regualation, and practice. under
program statement No 1210.21. and when he didn't do anything
after that he Violate. program statement No 3420.09 "Employee's
conduct and Responsbility" set by the Department of Justice. and
the office of Goverment Ethices.

[ Fourth Exception] Mrs E Fernaders; is the Assistant Health care
Admimistor. On Apt 30, 2009, Inmate Hibbs was walk over to mediacl
because his eye were burning, Mrs Fernaders said she didn't care
what was wrong with his eye, ther was no sick call. also ther was
RN-Crow. ther. but they didn't do anything, for the inmate to gave
the person medical care. but told him to come back the next day.
So he was walk back to his unite. and they had to get someone  to
walk him around so he could eat. So by doing this the medical staff
"Disregard" and "Fail" to go by policy. reguation and practice,
this "Misconduct" on ther part. And disregard to employee's conduct
and responesbility. that was issued by the office of Goverment
Ethice Board. and the Department of Justice. This kind of Misconduct
lead up to the Damage and injury to inmate Hibbs.

Exp of medical care,

In bld B-53 there is a Emergency Defibrillator: But ther is not anything in it. each unite has one, But the only blding that has one is bld 9. All the other are just Box on the walls. On March the 3 one of the inmate stare to "Hemorrhage" at about 2:30am ther was no medical staff here at the time. So the inmate went to the CO. office and let him know, that he did not feel good, by the time they got hold to the LT, and made call to the medical staff that was on call. Some time had pass, and by that time the inmate was hemorrhage , up blood and seting in a chair. by the time they call the outside E.M.T. they got ther and he was on the floor. by the time they got him out side to work on him he was gone. they work on him outside the unite about 15min. with C.P.R. and the defibillator. the next day in the unite they had what you would call a town hall. to tell us how sorry they were that he past away. they ask if ther was anything that us inmate would like to talk about or ask. thes are just a few of the thing.

1. why were ther not any medical staff here after last pill call.
2. How come the emergency defibrillator box, why was ther not one in it.
Why did you not call a hosp first.
4. why did you call the medical staff.
5. why did you not call the E.M.T. so they could have been on ther way.

Curtis Burtis; was the inmate who die.
3-25-2011 they Put Emergency Defibrillator in the Box in the Unites.
But dont Know if staff Know how to used them?

KSEAD015

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

RECEIVED
WARDEN'S OFFICE

APR 11 2011

BOBBY J. HIBBS # 26463-001 §
§
Plaintiff, §
§
VS. §
§
UNITED STATES OF AMERICA, ET AL. §
§
Defendants. §
§

FCI SEAGOVILLE

NO. 3:11-CV-0692-N

## FILING FEE ORDER

The Court, having considered plaintiff's Application for Leave to Proceed *In Forma Pauperis* in light of the Prison Litigation Reform Act of 1996 ("PLRA"), hereby **ORDERS** as follows:

1. Plaintiff is **GRANTED** leave to proceed pursuant to 28 U.S.C. § 1915.

2. The agency having custody of plaintiff shall, when funds exist in plaintiff's inmate trust account or institutional equivalent, forward to the Court an initial partial filing fee of $ <u>00.00</u>.

3. Plaintiff shall pay $<u>350.00</u>, the balance of the filing fee, in monthly installments as provided in 28 U.S.C. § 1915(b)(1). After payment of the initial partial filing fee, if any, the agency having custody of plaintiff shall deduct 20% of each deposit made to plaintiff's inmate trust account and forward payments to the Court on a regular basis provided the account exceeds $10.00.

4. Service of process shall be withheld pending judicial screening pursuant to 28 U.S.C. § 1915(e)(2) and/or 28 U.S.C. § 1915A.

5. No amendments or supplements to the complaint shall be filed without prior Court approval. A complete amended complaint shall be attached to any motion to amend.

6. All discovery in this case is stayed until defendants are ordered to answer by the Court.

7. No motions for appointment of counsel shall be filed until the Court has completed its screening pursuant to 28 U.S.C. § 1915(e)(2), which may include a hearing pursuant to *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985), the issuance of a questionnaire pursuant to *Watson v. Ault*, 525 F.2d 886 (5th Cir. 1976), or such other proceedings as are deemed appropriate by the Court.

8. Plaintiff shall notify the Court of any change of address by filing a written Notice of Change of Address with the Clerk. Failure to file such notice may result in this case being dismissed for want of prosecution.

9. The Clerk shall mail a copy of this Order to the inmate accounting office or other person(s) or entity with responsibility for assessing, collecting, and remitting to the Court the filing fee payments on behalf of inmates, as designated by the facility in which plaintiff is confined.

SIGNED this ___ day of April, 2011.

UNITED STATES MAGISTRATE JUDGE

# Federal Bureau of Prisons
## TRULINCS Account Transactions - Commissary
### Personal Inmate Information

| Inmate No: 26463001 | Inmate Name: HIBBS, BOBBY JOE | | Available Balance: $34.47 |
| --- | --- | --- | --- |

| Date | Reference # | Transaction Type | Sender Last name | Amount |
| --- | --- | --- | --- | --- |
| 6/10/2011 | KIPP0511 | Payroll - IPP | | $42.63 |
| 6/10/2011 | KSEAD015 - 2715 | Debt Encumbrance | | $8.52 |
| 6/8/2011 | 131 | Sales | | -$8.80 |
| 6/1/2011 | KSEAD015 - 2351 | Debt Encumbrance - Released | | $8.52 |

I Bobby Hibbs in Reference # KSEAD015 -2715 Date 6/10/2011. debt Encumbrance for $8.52. be Cancel. thank you for looking into this.

And return to my Account.

*Mr Hibbs*

Inmate Hibbs # 26463-001
★ This is a PLRA and is court ordered (See attached)
You can not stop this.

Mr McGaugh;

Medical Malpractice Claims.

Institution health services staff should review claims alleging malpractice or improper medical acre. After this review, a clear case description must be provided, including a history of all relevant medical treatment, medications, and services rendered to the claimant. A case description should also include any relevant medical justifications for the treatment rendered.

1. I like to see the Request for Consultation. that was send to the U.R.C. by your medical staff.
2. I have also ask for Credential Verification of medical staff in Oct of 2010, with no answer. they are.
   1. Doctor Capps;
   2. M Gifford-RN
   3. Robb Brain- PA-C
   4. A Camarines- M.L.P.
5. Mr Weaver-RN
   6. Mr Crow- RN
   6. Mr Nguyen- M.L.P.

You knew that the tort Claim was file. And under your own program statement's.

No. 1210.21 of [Misconduct] of Policy, Reguation and Practice. And No 3420.09, [Employees conduct and Responesbility] isssued by the office of Government Ethice Board. and The Department of Justice.
Of singnificant incidents of Breaches of Policy, Regualation, and Practice. of F.C.I. Employee's showing kind of "Misconduct" to inmate. and since the Allegations or Incidents are likely to Result in Liligation against the United State or the Bureau or one of it's Employee's. A Board of Inquiry should have invesligant the matter. why was it not done?
are you going to look into this matter. or do you want me to send it to U.S. Department of Justice. Federal Bureau of Prison. 320 1st Street, NW #654, Washington, DC 20534.

the next page show why.

[medical]

1. Doctor Capps. say ther no damage or injury to my eye. He even put down on medical
report that Unspecified Glaucoma were it say Progress. He has Improved.
his staff has not done anything other than. the ophthalmology following pt concerning,
on regular basis. that is ever 6 to 8 week. Can't be gaveing treatment in a timele matter.

Mrs Duckworth A. MD even has it put down that Unspecified Glaucoma Progress, Improved.
and see has naver seen me about my eye. until after all this happen.
DR Capps told me in march of 2010, if i need to know anything about my eye. I need to ✔
to talk with the eye doctor who see me.

GIFFORD, M RN- dose mostle Pillline, and when you talk with her, she tell you that
ther nothing she can do. and for you to make sick call the next day.

Robb,Brain PA-C. dosen't want to do anymore than he has to. like you will see on
his exibit S.   I know Mr Brain was not a part of my first case for damage or
injury. but when I see him. it like he show no regarud for what wrong with you.
and dosen't care. like with my IOP. he say he can't do anything, and he know that
the outside eye Doctor is for Consulatants. and they are the one who are to take
care of me.   So I like to have his name put on my case. because if he dosen't do
his job, the result could be more damage and injurt to my eye.

CamarinesA, MLP has been the only MLP that act like he real want to do something.
but it like his hand are tie, by B.O.P. rule. that keep him from doing anything.

[medical care]

One of the biggest problems for mene and woman behind the walls is how to get adequate medical care.

the prison system, if left to its own disigns would provide only the most minmum care-if that. Despite several class action law-suits chalthing the poor medical care receved by prisoners at varivus prions around the country, and countless individucal law suit filed by prisoner and their families alleging "Substandard care", " Cruel and Unusal" punisshhment and even worgful death, consistenlly delivered medical care in prison remains inaccessible to most people behind bars.

Prison medical care is about delivering the least amount of care for the least amount of money.

Terms and conditions of supervised release are reviewed for abuse of discretion. A district court has broad discretion to order special conditions of supervised release if each condition: 1) is reasonably related to the sentencing factors set forth in 18 U.S.C.S. § 3553(a); 2) involves no greater deprivation of liberty than is reasonably necessary for the purposes set forth in § 3553(a); and 3) is consistent with any pertinent policy statements issued by the Sentencing Commission. 18 U.S.C.S. § 3583. A condition is reasonably related if tailored to the nature and circumstances of the offense, the defendant's history and characteristics, the deterrence of criminal conduct, the protection of the public from further crimes of the defendant, and the defendant's educational, vocational, medicinal or other correctional needs.

How can you gave supervised release, for more time than the sentencing. and were it deprivation of liberty that is reasonably necessary.

© 2011 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

**SENSITIVE BUT UNCLASSIFIED**



# Federal Bureau of Prisons
# Psychology Data System

## 26463-001   HIBBS, BOBBY J. - All Comments

| | | | |
|---|---|---|---|
| 12-29-2010 | Static-99R | MONICA K. LASSETER, SEX OFFENDER PROG SPECLST | SEA |
| 05-26-2010 | Brief Counseling Session | LAINE T. JAFFE, CH PSYCH | SEA |
| 08-07-2009 | Eval/Rpt - Follow Up | MANDY M. RAMSEY, SEX OFFENDER PROG PSYCH | SEA |
| 08-05-2009 | Brief Counseling Session | MANDY M. RAMSEY, SEX OFFENDER PROG PSYCH | SEA |
| 03-20-2008 | Eval/Rpt - Sex Off Mgmt Pgm: Risk Assessment | JAMES A. SHADDUCK, SEX OFFENDER PROG COORD | SEA |
| 03-19-2008 | Eval/Rpt - Sex Off Mgmt Pgm: Contact | JAMES A. SHADDUCK, SEX OFFENDER PROG COORD | SEA |
| 03-19-2008 | Intake Screening | JAMES A. SHADDUCK, SEX OFFENDER PROG COORD | SEA |
| 05-24-2007 | Brief Counseling Session | STANETTE PINNIX HALL, STAFF PSYCH | ATL |

[Top]
## 12-29-2010  Static-99R  MONICA K. LASSETER, SEX OFFENDER PROG SPECLST          SEA

| ATT ENTICEMENT OF MINOR FOR SEXUAL ACTIVITY BY USE OF COMPUTER |
|---|
| TRANSPORTATION OF CHILD PORNOGRAPHY |

[Top]
## 05-26-2010     Brief Counseling Session          LAINE T. JAFFE, CH PSYCH          SEA

Mr. Hibbs was referred by the AW who was approached at mainline. Mr. Hibbs was requesting immediate placement in the SOMP program due to his failing eyesight. This is the first such request he has made according to our records. He was directed to the SOMP Coordinator to see if he qualifies for early placement into SOMP and psychology generally for personal support. He was very frustrated about his eyesight and seemed to be very blaming towards others generally, for example blaming psychology for not resolving his conflicts with Health Services.

[Top]
## 08-07-2009   Eval/Rpt - Follow Up          MANDY M. RAMSEY, SEX OFFENDER PROG PSYCH          SEA

Mr. Hibbs was seen for a follow up session to his last brief counseling session. The inmate had asked if he could be assessed for depression to see if he might require antidepressant medication. When asked how he has been doing since I last saw him, Mr. Hibbs reports that he saw health services staff for his knee and was told that he would be getting an X-Ray soon. He also states that the PA (he didn't know who he saw) also changed his medication from Ibuprofen to Naperson. Mr. Hibbs indicated that he was relieved that his medication was changed. He indicates that "I can feel it working already." He went on to talk about once of his cellee's who does not clean up after himself. He said that his other cellee is "cool" and that they all get along for the most part. He admits that he is "the senior in the room." I asked Mr. Hibbs if he recalled why I was seeing him today and he said "so I can vent." He forgot about his depression assessment and didn't request any need for an

antidepressant in this session.

I still assessed him for depression. Mr. Hibbs states that his energy is "alright" and that he is more active in the winter since he worries about having a stoke in the heat of summer. He says that his appetite is "good" and eats all his meals (3 a day) plus snacks. He denies that his appetite has increased or decreased. When questioned about his sleep, Mr. Hibbs says that it is "great." He says that his mood is "ok" and denied feeling sad, empty, or worthless. He says that his interest in routine activities has not diminished. In fact, he says that he reads and works to keep busy. He is planning on taking a CDL class with his friend (another SOMP inmate - Passons) for "shits and giggles." He admits that he already has a CDL license, but has no other classes to take at present. He "hangs out" with two inmates in particular and is working on moving in with one of them (the one with a longer sentence like him). He laughed and said that they have even had their pictures taken together. Mr. Hibbs denies having any problems with his concentration and denies any current suicidal ideation. He admits to one suicide attempt in the past (overdose on pills about 49 years ago when his grandmother passed away).

Overall, the inmate was alert, oriented, and in good reality contact. Speech was clear, coherent, and goal-directed. Hygiene was good. Good eye contact was maintained. He denies any symptoms of depression, psychosis, or anxiety. He does not currently meet the diagnostic criteria for a depressive disorder. He does not require a referral to health services for antidepressant medication. He denies any current suicidal or homicidal ideation, intent, or plans. He was future oriented and talked about his plans for post-release (e.g., either get back on disability or a recycling business). He appears stable and competent. He did not request any further psychological services, but did ask if he could speak to me on occasion if he felt the need to vent. He was encouraged to do so since this appeared to be of benefit. He was reminded how to contact psychology services for both routine and urgent issues. No follow up is necessary, unless requested.

[Top]

**08-05-2009  Brief Counseling Session**          **MANDY M. RAMSEY,  SEX OFFENDER PROG**   **SEA**
                                                  **PSYCH**

Mr. Hibbs was referred to me by Dr. Shadduck (SOMPC). The inmate sent a cop-out requesting to speak with a psychologist. Mr. Hibbs states that he is "frustrated" and wants to vent. He talked about various medical concerns that he feels are not being taken care of in a timely manner (e.g., hiatal hernia, lips/fingers turn blue, had 2 strokes in the past, has current knee problems, wants different pain medication since he has been taking Ibuprofen for a long time, he's on a long wait list for dental). He states that he is supposed to be seen by medical for his knee tomorrow. I encouraged him to talk about his concerns with health services staff. Mr. Hibbs went on to talk about the "unresponsive" nature of his unit team, the problems he has had with his FRP payment (has $100 left to pay off), and his lengthly sentence which he believes to be unfair (self-report 17 years with lifetime supervised release). Mr. Hibbs was questioned about his family support system and he says that his family lives in Oklahoma. His main support includes his ex-wife and 2 sons. He says that due to "tough times," he hasn't had a visit since 2007, but does talk on the phone and write to his family. When questioned what he is positive in his life, he says that he likes his job and is supposed to move to a grade 2 pay soon. He is also looking forward to getting into the non-res SOTP program, but is frustrated that he has to wait a while to get in the program (due to his PRD date). Mr. Hibbs had no specific requests for psychology, other than his potential need for antidepressant medication.

Overall, the inmate was alert, oriented, and in good reality contact. Speech was clear, coherent, and goal-directed. Hygiene was good. Good eye contact was maintained. He admits that he "might" be depressed, but wasn't sure. He denies any symptoms of psychosis or anxiety. He also denies any suicidal or homicidal ideation, intent, or plans at present. He was future oriented and talked about his future plans. He denies feelings of hopelessness, helplessness, or isolation. He admits that he talks to several inmates on the compound and works to keep himself busy. He appears stable and competent. He will receive follow up this week to further assess a diagnosis of depression.

[Top]

**03-20-     Eval/Rpt - Sex Off Mgmt Pgm: Risk   JAMES A. SHADDUCK,  SEX OFFENDER**

**2008     Assessment                          PROG COORD                                    SEA**
see attached

---

[Top]
**03-19-        Eval/Rpt - Sex Off Mgmt Pgm:  JAMES A. SHADDUCK,  SEX OFFENDER           SEA**
**2008          Contact                                PROG COORD**
Mr. Hibbs was introduced and oriented to FCI Seagoville's Sex Offender Management Program
(SOMP). He was informed of the Adam Walsh Child Protection and Safety Act, (2006) which requires
the Bureau to review releasing sex offenders for possible certification as "sexually dangerous
persons." The certification process was discussed in detail.

SOMP program components were also discussed including: mandatory evaluations (e.g., risk
assessments, pre-certification reviews, discharge reports), voluntary sex offender treatment services
(e.g., SOMP education, non-residential SOMP treatment, referrals to the residential SOTP program at
FMC Devens), and correctional management planning for those specific offenders who continue to
engage in risk-relevant behavior while incarcerated. The inmate was given the opportunity to ask
questions.

The inmate was introduced to SOMP program staff, and made aware of our open door policy for both
routine and urgent issues. The inmate was offered SOMP education, non-res SOMP treatment, and
SOTP residential treatment at FMC Devens. The inmate made the following decision(s):

> __X___ Inmate wants non-res SOMP tx, or says he wants it later in his sentence.
>
> (The inmate will be placed on the non-res SOMP wait list, and will have completed
> SOMP education.)
>
> _____ Inmate is unsure if he wants non-res SOMP tx, or wants to hear more information
> before he makes a decision.

(The inmate will continue in SOMP education.)

> _____ Inmate does not want non-res SOMP tx and does not want to hear more
> information.
>
> (The inmate declined both SOMP education and non-res SOMP treatment. The inmate
> was informed that he could change his mind in the future, but would need to inform
> SOMP staff. The inmate was informed that depending on their risk assessment level,
> they may be placed back on the call-out for a discharge report and offered treatment
> again.)
>
> _____ Inmate wants SOTP residential treatment at FMC Devens.
>
> (The inmate was given the Devens SOTP packet to read over and sign. The inmate will
> be placed on the SOMP residential wait list. If and when appropriate, a referral will be
> made by the SOMP Coordinator.)
>
> _____ Inmate does not want SOTP residential treatment at FMC Devens.
>
> (The inmate declined the residential SOTP program. He was informed that if he
> changed his mind in the future, he would need to talk with SOMP staff for a referral.)

---

[Top]

**03-19-2008   Intake Screening**        **JAMES A. SHADDUCK,  SEX OFFENDER PROG COORD**        **SEA**

A routine screening interview was conducted with Mr. Hibbs. The Limits of Confidentiality form was provided and he acknowledged his understanding of those limits by signing the form. The Psychology Data System (PDS) and SENTRY information was reviewed and relevant information from those sources were included in preparing this report.

Mr. Hibbs is a 58-year-old Caucasian-American male who states that he is from Oklahoma. He reports that his current concerns are medical and he is worried about his vision. He indicates he reported his symptoms to medical and they are following him . He is serving a 204 month sentence for attempting to sexually entice a minor over the internet, and he also has a prior sex offense. Mr. Hibbsdenies any history of mental health problems or treatment with the exception of becoming depressed in 1969 after his grandmother died, and experiencing suicidal ideation after his arrest for the instant offense.  He denies any recent or  present suicidal or homicidal ideation. He also denies ever being the victim of a sexual assault. The inmate does not present as a likely victim or predator in this correctional environment. Mr. Hibbs denies a history of drug abuse. . Overall, the inmate was alert, oriented, and in good reality contact. No psychotic or depressive symptoms were noted or reported. An MDS assignment does not appear warranted. Follow up was not requested by Mr. Hibbs , nor does it appear necessary. Mr. Hibbs was informed about how to access psychology services for routine and urgent issues.

[Top]

**05-24-2007   Brief Counseling Session**        **STANETTE PINNIX HALL,  STAFF PSYCH   ATL**

Inmate Hibbs was seen today in DCU due to past history of suicidal ideation.  He was interviewed in person in DCU. Inmate was cooperative during this interview. He appears to be currently stable. No current significant mental health symptoms were reported. He states he is doing okay. He expressed concern about receiving his pain medication. Denied current suicidal ideations, intent or plans. Thought processes were logical and goal directed. Orientation was to person, place, time and situation. Denied current auditory or visual hallucinations. He plans to send cop out to Psychology if further intervention is needed.

**FILED**

'SEP 1 9 2011

CLERK, U. S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

3:01-cr-107-4-33 mcr

I, the undersigned authorized officer of the ___FC1 Seagoville___

(name of institution)

where ___Hibbs, Bobby___, Inmate ID No. _26463-001_, is confined

(name of inmate)

as a prisoner, do hereby certify that:

(1)    On this day the prisoner has in his account the sum of $ _41.12_

(2)    During the past six months, the prisoner's:

Average monthly balance was $_____.

Average monthly deposits to the prisoner's account were $ _47.00_.

Attached is a certified copy of the prisoner's trust account statement (or institutional equivalent)

showing transactions for the past six months.

Signed this _19_ day of ~~February~~ Sept, 20_11_.

_Brox, Counselor_

Authorized Officer

_FC1 Seagoville._

Institution of Confinement

Authorization

I, the undersigned inmate, authorize the institution where I am incarcerated to withdraw and forward to
the court any initial partial filing fee or appeal fee and any subsequent installments ordered by a Court under the
laws of 28 U.S.C. § 1915.

_Bobby Hibbs_

Signature of Prisoner/Plaintiff/Appellant
Institution ID No. _26463-001_

## All Transactions



| | |
|---|---|
| **Inmate Reg #:** | 26463001 |
| **Inmate Name:** | HIBBS, BOBBY |
| **Report Date:** | 02/09/2011 |
| **Report Time:** | 8:52:40 AM |

| | |
|---|---|
| **Current Institution:** | Seagoville FCI |
| **Housing Unit:** | SEA-B-A |
| **Living Quarters:** | B01-116L |

| Date/Time | Transaction Type | Amount | Ref# | Payment# | Balance |
|---|---|---|---|---|---|
| 2/7/2011 2:35:33 PM | Payroll - IPP | $40.60 | KIPP0111 | | $41.12 |
| 1/29/2011 8:31:57 AM | TRUL Withdrawal | ($2.00) | TL0129 | | $0.52 |
| 1/27/2011 11:05:47 AM | TRUL Withdrawal | ($2.00) | TL0127 | | $2.52 |
| 1/21/2011 1:35:36 PM | TRUL Withdrawal | ($2.00) | TL0121 | | $4.52 |
| 1/12/2011 11:20:03 AM | Sales - No FP (Non-FP Institution) | ($27.70) | 10 | | $6.52 |
| 1/10/2011 6:29:05 PM | Phone Withdrawal | ($4.00) | TFN0110 | | $34.22 |
| 1/10/2011 2:10:11 PM | TRUL Withdrawal | ($5.00) | TL0110 | | $38.22 |
| 1/10/2011 9:21:40 AM | Payroll - IPP | $42.63 | KIPP1210 | | $43.22 |
| 12/22/2010 11:30:57 AM | Sales - No FP (Non-FP Institution) | ($10.80) | 14 | | $0.59 |
| 12/15/2010 2:35:14 PM | TRUL Withdrawal | ($2.00) | TL1215 | | $11.39 |
| 12/15/2010 11:41:22 AM | Sales - No FP (Non-FP Institution) | ($23.75) | 20 | | $13.39 |
| 12/10/2010 12:26:58 PM | Phone Withdrawal | ($4.00) | TFN1210 | | $37.14 |
| 12/10/2010 7:35:39 AM | Payroll - IPP | $40.60 | KIPP1110 | | $41.14 |
| 11/20/2010 9:44:43 AM | Phone Withdrawal | ($1.00) | TFN1120 | | $0.54 |
| 11/17/2010 12:53:11 PM | Sales - No FP (Non-FP Institution) | ($3.55) | 26 | | $1.54 |
| 11/10/2010 2:26:24 PM | Phone Withdrawal | ($5.00) | TFN1110 | | $5.09 |
| 11/10/2010 11:34:40 AM | Sales - No FP (Non-FP Institution) | ($30.79) | 19 | | $10.09 |
| 11/8/2010 10:31:10 AM | Payroll - IPP | $40.60 | KIPP1010 | | $40.88 |
| 10/15/2010 8:03:10 PM | Phone Withdrawal | ($5.00) | TFN1015 | | $0.28 |
| 10/14/2010 6:04:43 PM | Sales - No FP (Non-FP Institution) | ($13.00) | 23 | | $5.28 |
| 10/14/2010 6:01:26 PM | Sales - No FP (Non-FP Institution) | ($24.95) | 21 | | $18.28 |
| 10/8/2010 8:50:27 AM | Payroll - IPP | $42.63 | KIPP0910 | | $43.23 |
| 9/21/2010 7:08:59 PM | Phone Withdrawal | ($4.00) | TFN0921 | | $0.60 |
| 9/21/2010 6:29:01 PM | Sales - No FP (Non-FP Institution) | ($10.12) | 54 | | $4.60 |
| 9/15/2010 6:04:02 PM | Sales - No FP (Non-FP Institution) | ($2.00) | 31 | | $14.72 |
| 9/15/2010 6:03:51 PM | Sales - No FP (Non-FP Institution) | $2.20 | 30 | | $16.72 |
| 9/15/2010 6:02:17 PM | Sales - No FP (Non-FP Institution) | ($26.30) | 29 | | $14.52 |
| 9/11/2010 9:15:23 AM | Phone Withdrawal | ($4.00) | TFN0911 | | $40.82 |
| 9/10/2010 10:01:57 AM | Payroll - IPP | $44.66 | JIPP0810 | | $44.82 |
| 8/31/2010 2:20:55 PM | Phone Withdrawal | ($1.00) | TFN0831 | | $0.16 |
| 8/23/2010 8:49:58 PM | Phone Withdrawal | ($4.00) | TFN0823 | | $1.16 |
| 8/18/2010 3:37:35 PM | Phone Withdrawal | ($2.00) | TFN0818 | | $5.16 |
| 8/13/2010 12:01:54 PM | Phone Withdrawal | ($4.00) | TFN0813 | | $7.16 |
| 8/11/2010 11:27:36 AM | Sales - No FP (Non-FP Institution) | ($31.77) | 9 | | $11.16 |
| 8/9/2010 7:48:22 AM | Payroll - IPP | $42.63 | JIPP0710 | | $42.93 |
| 7/25/2010 4:54:25 PM | Phone Withdrawal | ($1.00) | TFN0725 | | $0.30 |
| 7/14/2010 6:51:52 PM | Sales - No FP (Non-FP Institution) | ($38.98) | 30 | | $1.30 |
| 7/10/2010 6:39:30 AM | Phone Withdrawal | ($5.00) | TFN0710 | | $40.28 |
| 7/9/2010 12:51:37 PM | Payroll - IPP | $44.66 | JIPP0610 | | $45.28 |
| 6/30/2010 6:59:27 PM | Sales - No FP (Non-FP Institution) | ($2.20) | 90 | | $0.62 |
| 6/30/2010 6:57:25 PM | Sales - No FP (Non-FP Institution) | ($2.58) | 88 | | $2.82 |
| 6/13/2010 11:06:38 AM | Phone Withdrawal | ($4.00) | TFN0613 | | $5.40 |
| 6/9/2010 11:23:31 AM | Sales - No FP (Non-FP Institution) | ($30.70) | 12 | | $9.40 |
| 6/7/2010 10:33:56 AM | Phone Withdrawal | ($1.00) | TFN0607 | | $40.10 |
| 6/7/2010 8:55:48 AM | Payroll - IPP | $40.60 | JIPP0510 | | $41.10 |
| 6/1/2010 11:55:32 AM | Phone Withdrawal | ($3.00) | TFN0601 | | $0.50 |
| 5/14/2010 7:55:01 PM | Phone Withdrawal | ($5.00) | TFN0514 | | $3.50 |
| 5/12/2010 5:25:15 PM | Sales - No FP (Non-FP Institution) | ($36.31) | 41 | | $8.50 |
| 5/10/2010 9:54:02 AM | Payroll - IPP | $44.66 | JIPP0410 | | $44.81 |

# Inmate Inquiry

 **PRINT**

| | | | |
|---|---|---|---|
| **Inmate Reg #:** | 26463001 | **Current Institution:** | Seagoville FCI |
| **Inmate Name:** | HIBBS, BOBBY | **Housing Unit:** | SEA-B-A |
| **Report Date:** | 02/09/2011 | **Living Quarters:** | B01-116L |
| **Report Time:** | 8:49:48 AM | | |

General Information | Account Balances | Commissary History | Commissary Restrictions | Comments

## General Information

| | |
|---|---|
| Administrative Hold Indicator: | No |
| No Power of Attorney: | No |
| Never Waive NSF Fee: | No |
| Max Allowed Deduction %: | 100 |
| PIN: | 4156 |
| PAC #: | 229381502 |
| FRP Participation Status: | Completed |
| Arrived From: | OKL |
| Transferred To: | |
| Account Creation Date: | 5/23/2007 |
| Local Account Activation Date: | 3/14/2008 3:18:27 AM |

| | |
|---|---|
| Sort Codes: | |
| Last Account Update: | 2/7/2011 2:35:33 PM |
| Account Status: | Active |
| Phone Balance: | $0.62 |

### FRP Plan Information

| FRP Plan Type | Expected Amount | Expected Rate |
|---|---|---|

## Account Balances

| | |
|---|---|
| Account Balance: | $41.12 |
| Pre-Release Balance: | $0.00 |
| Debt Encumbrance: | $0.00 |
| SPO Encumbrance: | $0.00 |
| Other Encumbrances: | $0.00 |
| Outstanding Negotiable Instruments: | $0.00 |
| Administrative Hold Balance: | $0.00 |
| Available Balance: | $41.12 |
| National 6 Months Deposits: | $294.35 |
| National 6 Months Withdrawals: | $253.53 |
| National 6 Months Avg Daily Balance: | $7.69 |
| Local Max. Balance - Prev. 30 Days: | $43.22 |
| Average Balance - Prev. 30 Days: | $7.31 |

# Commissary History

### Purchases

Validation Period Purchases: $27.70
YTD Purchases: $134.54
Last Sales Date: 1/12/2011 11:20:03 AM

### SPO Information

SPO's this Month: 0
SPO $ this Quarter: $0.00

### Spending Limit Info

Spending Limit Override: No
Weekly Revalidation: No
Bi-Weekly Revalidation: No
Spending Limit: $290.00
Expended Spending Limit: $18.90
Remaining Spending Limit: $271.10

# Commissary Restrictions

### Spending Limit Restrictions

Restricted Spending Limit: $0.00
Restricted Expended Amount: $0.00
Restricted Remaining Spending Limit: $0.00
Restriction Start Date: N/A
Restriction End Date: N/A

### Item Restrictions

| List Name | List Type | Start Date | End Date | Active |
|-----------|-----------|------------|----------|--------|

# Comments

### Comments: